**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Frederick Augustus MORAN, Frederick Winston Moran, Moran Asset Management Inc., and Moran & Associates, Inc., Securities Brokerage, Defendants.**

No. 95 Civ. 4472 (BN).

United States District Court, S.D. New York.

April 2, 1996.

---

United States Securities and Exchange Commission (of counsel: Richard E. Simpson, Mark Kreitman, Ann H. Sulzberg), Washington, DC, for Plaintiff.

Kelley Drye & Warren (of counsel: Robert A. Horowitz, Karen Y. Bitar), Stamford, CT, for Defendants Frederick Augustus Moran, Moran Asset Management, Inc., and Moran & Associates, Inc., Securities Brokerage.

Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P. (of counsel: Joseph P. Armao, Philip S. Raible), New York City, for Defendant Frederick Winston Moran.

### OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge:[1]

The United States Securities and Exchange Commission ("SEC"), brings this civil securities fraud enforcement action against Frederick Augustus Moran ("Moran Sr."), Frederick Winston Moran ("Moran Jr."), Moran Asset Management Inc. ("Moran Asset"), and Moran & Associates, Inc., Securities Brokerage ("Moran Brokerage"). Specifically, the SEC alleges that Moran Sr., Moran Jr., Moran Asset, and Moran Brokerage engaged in insider trading thereby violating Section 10(b) of the Securities Exchange Act of 1934 ["the Exchange Act"] and Rule 10(b)(5) thereunder; that Moran Sr. and Moran Asset defrauded their clients in violation of Sections 206(1) and (2) of the Investment Advisers Act of 1940 ["the Advisers Act"]; and that Moran Sr., Moran Asset, and Moran Brokerage made willful misstate-

---

1. Bernard Newman, Senior Judge of the United States Court of International Trade, sitting as United States District Judge by designation.

ments and omissions in violation of Sections 204 and 207 of the Investment Advisers Act of 1940, Rule 204–1(b)(1) thereunder, Section 15(b) of the Securities Exchange Act of 1934, and Rule 15b3–1 thereunder. The SEC seeks judgment permanently enjoining each of the defendants from violating the pertinent provisions of the Exchange Act and the Advisers Act, disgorgement of all illegal profits, prejudgment interest arising from the alleged insider trading, payment of three time civil penalties based on the insider trading, and civil money penalties for the violations of the Advisers Act alleged in the complaint. The defendants deny each of the allegations lodged against them and seek dismissal of the complaint.

The matter arises under the court's jurisdiction, pursuant to the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u–1, and 78aa] and the Advisers Act [15 U.S.C. §§ 80b–9(e) and 80b–14]. With the consent of each party, the court bifurcated the liability phase of this case from any subsequent penalty phase. *See* Order dated October 30, 1995. Accordingly, the only issues presented to the court at this juncture are the liability of the defendants for the charges in the complaint. The case was tried to the court in a twelve day bench trial. In conformity with F.R.C.P.Rule 52(a), the following constitutes the court's findings of fact and conclusions of law.

## THE RECORD

In its direct case, the SEC presented eight witnesses: John Reddan, executive vice-president and security analyst for Moran & Associates Securities Brokerage from May 1985 until October 31, 1995; defendant Frederick Winston Moran, a vice-president at Salomon Brothers; defendant Frederick Augustus Moran, president of Moran Asset Management and Moran & Associates Brokerage[2];

2. Moran Sr. and Moran Jr. were called as hostile witnesses by the SEC.

3. In the interest of judicial economy, the defendants were permitted to offer the direct testimony of Moran Sr. and Moran Jr., after they were directly examined by plaintiff.

4. Over objection of both defendants the court ruled that it would "permit the SEC to call

Richard Scribner, chief compliance officer for Salomon Brothers, Inc.; Edward Meyercord, vice-president in investment banking for Salomon Brothers; Frank Poli, an attorney, who in 1993 was the head trader for Moran Asset Management; Peter D. Crawford, executive director of investor relations and share owner relations for Bell Atlantic Corporation; and Kevin Tarrant, manager of investor relations for Bell Atlantic Corporation. Defendants did not present any witnesses.[3] On rebuttal plaintiff called Raymond Liguori, who was employed as the telecommunication analyst for Salomon Brothers in October 1993[4]. Pursuant to agreement by counsel and F.R.C.P.Rule 32(a)(3)(E), the depositions of Susan Putnam, vice-president of Moran Asset and Moran Brokerage, Katherine Dietze Courage, a director at Salomon Brothers, Richard Holbein, the president of Pension Asset Consulting Associates Inc., and Jennifer Netterville, the investment officer of Louisiana Teacher's Retirement Fund, were admitted into evidence. The parties moved 213 exhibits into evidence.

## CONTENTIONS OF THE PARTIES

The SEC alleges that Moran Sr. and his companies acted upon inside information about two cable companies provided by Moran Jr, his son. According to the SEC, Moran Jr. "tipped" Moran Sr. with respect to a merger between Bell Atlantic and Telecommunications Incorporated ("TCI"). This circumstantial case revolves around the fact that Moran Jr., as an employee of Salomon Brothers, was in possession of material, non-public information with respect to the Bell Atlantic–TCI merger. Moran Sr. who had previously been reticent to trade cable stocks, after a series of phone conversations with Moran Jr., made large purchase of Liberty, TCI and other cable company stocks on

[Ligouri] as a rebuttal witness for the limited purpose of testifying as to whether he knew of a strategy of Salomon Brothers to release information about the merger to the media or anybody else prior to the official announcement and whether he personally did release any such information" (R. 1040). Since this rebuttal witness was not on the witness list, the court gave the option to the defendants to depose him before he testified.

October 11, 1993, two days before the October 13, 1993 official announcement of the merger. The SEC argues that because Moran Sr. and his companies had lost substantial money and clients as the result of a very unsuccessful prior investment in Chamber Development stock, Moran Sr. needed a "sure winner." Moreover, plaintiff contends that Moran Jr. had a history of violating Solomon Brothers' policies regarding confidential information in order to benefit Moran Sr.'s firms, thereby demonstrating an intent on the part of Moran Jr. to provide his father with confidential information. Finally, plaintiff alleges that because Moran Sr. had previously been bearish on cable, these October 11th stock purchases constituted an aberrant trading pattern for Moran Sr., there were several phone calls between Moran Sr. and Jr., including one for over forty minutes the week before Moran Sr. made the stock purchases, and Moran Sr. faxed to Moran Jr. the Moran "morning meeting notes" specifying the switch in cable policy on the morning of the stock purchases indicates that the defendants traded the cable securities as a result of material, non-public information in violation of the Exchange Act and Rules thereunder.

The SEC further states that Moran Sr. and Moran Asset violated sections 206(1) and (2) of the Advisers Act [5]. Specifically, it charges that Moran Sr. allocated shares of Liberty stock to his personal and family account at a lower price than paid by his clients, thereby placing his own interest above that of his clients. Additionally, the SEC claims that Moran Sr. and his companies violated Sections 204 and 207 of the Advisers Act, as well as, Section 15(b) of the Exchange Act. Although Moran Asset was required to promptly file amendments to its Form ADV when previous information became inaccurate, the SEC asserts that Moran Asset did not include the names of Moran Sr.'s wife and two of his children who were named as directors. The SEC points out that even when the Form ADV was amended to include Moran Sr.'s wife, no mention was made of his two children who had been elected directors. Further, the SEC charges that

Moran Brokerage violated the Exchange Act in that an amendment to its Form BD was not timely filed when Moran Sr.'s wife and children became directors. Moran Sr., as a "control person" of the companies is charged with accomplice liability of these omissions which plaintiff maintains are willful and material.

Defendants deny each of the charges. Specifically, Moran Sr. and Moran Jr. respond that Moran Jr. in no way "tipped" any material non-public information with respect to the Bell Atlantic–TCI merger. Defendants maintain that Moran Sr.'s change of heart regarding the cable stocks came about as a result of the actions of Dr. John Malone, a "giant" in the cable industry. Moran Sr. claims that his return to purchasing cable stocks resulted from following Malone's lead. Indeed, defendants additionally point out that news of the impending merger was made public through newspaper articles in the New York Times and the Wall Street Journal. Moran Sr. argues that it was during the weekend of October 9–10, after reading a Wall Street Journal article about a merger between TCI and Liberty, that he made his final decision to begin investment in cable stocks.

Defendants Moran Sr. and Moran Asset also dispute the allegations regarding the Advisers Act. Moran Sr. asserts that while there was an error with regard to the amount of stock that was purchased as well as its allocation, the error was an honest mistake that did not involve any fraud or misrepresentation with respect to the dissemination of investment advice. Moreover, defendants contend that there was no "willful" omissions on either the Form ADV or Form BD. While Moran Sr. concedes that his wife and two sons were not listed on the forms as directors, he maintains that such omission was inadvertent and was ultimately corrected. In addition, defendants contend that the omitted information was not "material" and therefore its omission was not a violation of securities law.

Finally, the parties disagree as to the appropriate burden of proof for this case. The SEC argues that the proper burden of proof

---

5. Moran Jr. is only alleged to be liable for the insider trading allegation.

is preponderance of the evidence. Defendants counter that because the potential liability faced by the defendants would in effect constitute a loss of livelihood, the proper standard is proof by clear and convincing evidence.

## FINDINGS OF FACT

Frederick Augustus Moran ("Moran Sr.") is the president and principal portfolio manager of Moran Asset Management Inc., as well as the president and director of research of Moran & Associates, Inc. Securities Brokerage. Frederick Winston Moran Jr. ("Moran Jr.") is Moran Sr.'s eldest son and has been employed since March 1993 by Salomon Brothers Inc. as an analyst specializing in the cellular telephone and wireless communications industries. In July 1993, while working for Salomon Brothers, Moran Jr. expanded his focus to the cable television industry for Salomon Brothers. Moran Asset Management, Inc. ("Moran Asset") since 1986 has been a registered investment adviser. Moran & Associates, Inc. Securities Brokerage ("Moran Brokerage") since 1987 has been a registered broker-dealer. Moran Sr. and his wife Joan, during the periods in question each owned 50% of the stock of Moran Asset and Moran Brokerage.

### The Insider Trading Claim

#### Overview of Events

On October 3, 1993, Moran Jr. was "brought over the wall [6]" at Salomon Brothers with regard to a proposed merger between Telecommunication Incorporated ("TCI") and Bell Atlantic. Moran Jr. was told that the official announcement of the merger would come "within a week to two weeks" (R. 437). On Wednesday, October 6, Moran Jr. was briefed on the details of the proposed Bell Atlantic/TCI merger and told by Edward Meyercord that the announcement was expected to take place early the following week. Moran Jr.'s understanding was that the announcement date "would probably be the 13th, or certainly the 12th, 13th, or 14th" (R. 437). On Thursday, October 7, the Wall Street Journal published an article entitled "TCI Reported In Talks To Buy Liberty Media" (Exhibit 11).

Moran Jr. attended a meeting at Bell Atlantic headquarters in Philadelphia on October 9, 1993. The purpose of the meeting was twofold. First, there were discussions about how to best market the Bell Atlantic/TCI merger. Second, the speech that the president of Bell Atlantic would deliver when the deal was announced was drafted. At this meeting Salomon Brothers representatives, including Moran Jr., learned for the first time that the definitive date of the announcement regarding the merger was October 13. According to Meyercord, "there was a very detailed media plan that was put together and ... there was to be a public announcement in New York City in the morning in which the analyst community would be present" (R. 894). This media plan also set forth October 13 as the date of the public announcement (Exh. 1).

On October 11, 1993 Moran Sr. bought approximately 340,000 and 203,000 shares of TCI and Liberty stock respectively. During the evening of October 12, Moran Jr. told employees of Moran Asset and John Reddan about the merger. The proposed merger of Bell Atlantic and TCI was publicly announced by a press release issued at approximately 7:00 a.m. on October 13.

#### Moran Sr.'s Trading Practice

From 1987 through 1991 Moran Sr. invested at least 35% and as much as 45% of his clients' managed funds in cable television stocks. In 1991, Dr. John Malone, the President and Chief Executive Officer of TCI, the largest cable company in the world, began moving his personal wealth out of TCI, a cable television operator company, and into Liberty, a programing company. Moran Sr. testified that at the time of Malone's transaction, the move did not seem significant "because [Moran Asset's] impression was that [Malone] had exercised only half of his rights and [Moran Sr.] thought that was therefore a case of saying to the world I am not abandoning Liberty and it was something he did with that in mind and he had not exercising

6. To be "brought over the wall" refers to the practice of disclosing to an analyst confidential non-public information about a client so that the analyst can work on the client's secret matter.

all of his rights" (R. 1406–07; 1411 Moran Sr. Exh. CX). At that juncture, Moran Sr. believed that Malone was actually increasing his backing of TCI and therefore Moran Sr. increased his purchases of TCI stocks. In fact, however, Dr. Malone was tendering all of his TCI shares in exchange for increased stocks in Liberty (R. 773, 1413; Moran Sr. Exhs. CW, CQ). From October 25, 1991, when Dr. Malone publicly disclosed his venture into Liberty, and until Liberty recombined with TCI, Liberty's stock price had increased by 3000 percent. During this time Moran Sr. was still a proponent of cable stocks.

Beginning in 1992 Moran Sr.'s view of the cable industry began to change. In addition, Moran Sr. learned on January 7, 1992 that Malone had actually liquidated his TCI holdings to pay for his investment in Liberty. Moran Sr. was further aware that Malone was an outspoken critic of government regulation of the cable industry and predicted a negative impact would result. In response to the problems he believed would result from increased regulation of the cable industry, as well as the discovery that Malone had in fact been divesting himself from TCI holdings, Moran Sr. began selling cable stocks in Moran Asset's client accounts beginning in 1992 (R. 780–82; Exhs. 39–40). On January 8, 1992 Moran Sr. began selling TCI and Comcast stock and within several weeks Moran Asset sold out all its cable stock positions almost completely. According to Moran Sr., the decision to sell was made by him without first consulting Moran Jr. or John Reddan.

In addition to selling TCI stock, Moran Sr. decided to cover the short position he had in Liberty stock [7]. According to Reddan, the short position was closed at a substantial loss. With respect to Moran Sr.'s reaction after these transactions, Redden testified that "[Moran Sr.] said we've got to learn our lesson here. Malone has a tremendous fol-

lowing. [Moran Sr.] never wanted to go against him again. And it was more—our feeling that Malone's following was more powerful than we had estimated" (R. 775) [8]. During 1993, Malone appeared to be moving further into programming and away from cable television. This move was well documented in Moran Brokerage *Morning Meeting* Notes. Specifically, the notes stated:

There is a rumor that TCI will purchase Liberty Media's cable properties. This would mean 1) John Malone would be reducing further his cable interests and moving further into programming inhibits the cable companies ability to pass on programming price increases.

(Morning Meeting Note May 27, 1993, Moran Sr. Exh. K).

NYT article:—Cable television John Malone is moving further into programming in response to regulatory and technological changes.

(Morning Meeting Note, June 1, 1993, Moran Sr. Exh. L).

Fortune article: John Malone calls President Clinton a bold face liar. Two possible reasons for this unguarded behavior are: 1) he is so frustrated with what Congress has done to the cable industry, or 2) won't be around to bear the consequences. Recently he has begun to say it is too much trouble for him to be Chairman of both Liberty Media and Telecommunications.

(Morning Meeting Note, June 14, 1993, Moran Sr. Exh, M).

[Liberty Media is] rumored to be planning to swap its interests in cable system for TCI's interest in programming assets—especially Turner Broadcasting and Discovery Channel. Malone is moving away from cable systems and toward programming.

(Morning Meeting Note, September 20, 1993, Moran Sr. Exh. N).

---

**7.** A short position is selling a stock that you do not own with the intention of buying it back at a lower price. In this case, however, when Moran Asset bought back the Liberty stock to cover the short position, the stock was purchased at a higher price resulting in a substantial monetary loss to Moran Asset.

**8.** Following Malone with respect to the cable industry is a well recognized practice on Wall Street. Malone had been characterized as "the cable industries most brilliant and creative player," a "multimedia god," and that investing along side Malone "has proved to be profitable," "has continuing merit"

It is undisputed that from 1992 and into August 1993 Moran Sr. was "bearish" on cable stocks. Indeed, published materials from Moran Brokerage clearly demonstrate Moran Sr.'s unfavorable view of cable stock. In Moran Asset's morning meeting notes from March, April, and June 1993, Moran Sr. predicted that "cable TV stocks, as a group, offer modest upside potential and substantial downside risk," that regulation "was more severe than our forecasted worst case scenario," and that "the focus on technology in cable is causing investors to overlook a serious negative—reregulation" (Exhs. 38 and 45). Included in Moran Sr.'s negative view of the cable television industry was TCI. Aside from completely liquidating all of the Moran Asset's holdings in TCI in 1992, Moran Asset's good relationship with TCI came to an end because according to Reddan, "we had become negative on the cable industry" (R. 61). In the Moran Morning Meeting notes of July 20, 1993, Moran Brokerage concluded that:

> [TCI] Conference call regarding effects of reregulation: effect is somewhat less than expected. Annual revenue is reduced roughly 3% to 4% compared to a 6% to 8% expected.... Even with relatively mild effects, six of TCI's credit agreements will go into technical default. Continue to recommend strength as growth will be very tough over next year.

(Exh. 107). Even as late as September 24, 1993 Moran's morning meeting note stated that "Sumner Redstone's antitrust lawsuit against TCI, Liberty Media and QVC has very serious long term negative implications for those companies. It is likely to ... increase regulatory scrutiny or pressure on those companies" (Exh. 38 at 55; R. 1172–73).

Moran Sr.'s position on cable stocks becomes an issue of dispute between the parties starting in September 1993. The last recommendation to sell cable stocks appeared in Moran Brokerage's morning meeting note for August 26, 1993 (Moran Sr. Exh. BF). While future morning meeting notes, up until the time in question did not include a recommendation to buy cable stocks, the recommendation was the more neutral "hold."

According to Reddan, Moran Sr. "began to soften his views in September of 1993, and in October of 1993 he changed his views" (R. 782).

In support of his claim that he was changing his view of cable stocks, Moran Sr. points to the fact that he, along with Susan Putnam, attended a Donaldson Lufkin & Jenrette media conference relating in part to the cable industry from September 20 to September 22, 1993. While there, Moran Sr. learned both that the industry was developing the technology to compete with local telephone companies for long distance access charges by enabling cable companies to carry long distance service over coaxial telephone lines and that Bell Atlantic was permitting cable companies to access its research related to video service over the "twisted pair" copper wires which carry telephone service (R. 1464–1468; Moran Sr. Exh. O). Moran Sr. also learned of technological advances being made by cable companies with respect to their potential long distance capabilities on September 23, 1993 at a Scientific Atlanta meeting. Believing that this innovation could produce an "enormous revenue stream" for cable companies, Moran Sr.'s notes made at the conference read: "Conclusions—sell [local exchange carriers] ... buy cable" (R. 1468–1471; Moran Sr. Exh. P). In fact, Moran Sr. set forth in the Moran Brokerage Morning Meeting Notes of September 24, 1993 that:

> *Bottom Line:* Of all these competitors, the telcos are in poorest position to compete in video services. Cable companies will enter the long distance telephone business. Cable companies in nine months will attach unit to outside of the home that will reverse amplifiers on existing coax reverse line, will carry the telephone signal. Long distance calls will be offered. AT & T wants the cable companies there to reduce the access charges. Cable companies will be looking at an enormous revenue stream

Moran Sr. Exh. S. Thus, Moran Sr. asserts, the evidence demonstrates that he was now "primed to get back into cable." *See* Frederick A. Moran's Post Trial Brief, p. 19.

The SEC, on the other hand, argues that the Moran Sr.'s claim that he was turning

bullish on cable stocks beginning in August 1993 is contradicted "not only by the morning meeting notes, but also by the testimony of Susan Putnam." *See*, Plaintiff's Proposed Finding of Fact and Conclusions of Law, p. 35. In support of this claim, the SEC points to the morning meeting note of September 24, 1993 addressing the Redstone anti-trust lawsuit against TCI (Exh. 55). In addition, Putnam stated that after seeing a presentation with respect to the Jones Intercable on September 23, 1993, she suggested to Moran Sr. that it might be an "interesting" investment idea (Putnam Deposition, p. 88). Putnam recalled Moran Sr. telling her that "he felt regulation was still a major problem." (*Id.*). The SEC maintains that this evidence demonstrates that Moran Sr. was not interested in investing in cable. With respect to the other proof relied upon by Moran Sr., the SEC suggests that the very technology Moran Sr. claims he was impressed with, was actually nothing more than innovations which Reddan had been expecting "for some time during the year 1993" (R. 822). Coupled with the fact that Moran did not buy any cable stock after attending the conferences and assigned Scientific Atlanta to Susan Putnam for further study, the SEC concludes that Moran Sr. was still "bearish" on cable.

In resolving this dispute of fact, the court finds that while there is no suggestion that Moran Sr. turned "bullish" on cable stocks in September 1993, there is ample credible evidence that Moran Sr. had begun to soften his view on the cable industry. Indeed, the SEC admits that Moran Sr.'s "firm decided to do more research on the cable phone." SEC Proposed Findings of Fact and Conclusions of Law, p. 36. Additionally, while the conversation with Putnam indicates Moran Sr. was still concerned with regulation of the cable industry, the court will not ignore the documentary evidence with respect to telecommunications, which Moran Sr. would reasonably consider in deciding upon a position to take about cable stocks. Moreover, contrary to Moran Asset's practice since 1992, after August 26, 1993, Moran Morning Meeting Notes no longer included a "sell" recommendation with respect to cable stocks. Significantly, on August 24, 1993, Bell Atlantic

won a lawsuit challenging the 1984 Cable Act, which prohibited telephone companies and their affiliates from providing video programming to subscribers in their own telephone service area. While this decision paved the way for competition in the cable television industry, Moran Sr. viewed the "competition as an alternative to regulation" (R. 1459). Knowing that its monopoly status was behind the regulation of the cable industry, Moran Sr. reasoned that "if you had competition in place instead of regulation, you wouldn't need regulation" (R. 1459). Finally, Moran Sr. did not fear the idea of competition in the cable industry because he "had clearly determined the cable companies would be overwhelming winners" (R. 1459). Referring to a report Moran Sr. had previously published he stated, "[a]s far back as 1988 we made that decision" (R. 1459; Moran Sr. Exh. A).

While the SEC argues that "one would most reasonably expect that if the Moran firms were again to take a long position in cable stocks, they would do so either (a) in an orderly fashion; (b) on the basis of careful, detailed and documented research into the fundamentals of cable companies; and/or (c) over an extended period of time," (SEC Proposed Finding of Facts and Conclusions of Law, p. 36), the evidence in this case amply demonstrates that was not the way Moran Sr. typically operated. Reddan testified that "Fred's style is to jump in with both feet. Over the course of our ten-year relationship, we've had many of these disagreements primarily because of a difference in approach. I'm more cautious; Fred is more—acts more decisively" (R. 139). Accordingly, the court finds that the evidence supports defendants' contention that Moran Sr. was softening his view on the cable industry.

*The Alleged Motive and Intent of Moran Jr. to give and Moran Sr. to Trade using Material Non–Public Information*

The SEC alleges that because of a very negative experience with Chamber's Development stock, Moran Sr. had a motive to want a "sure thing." In addition, the SEC

further claims that Moran Jr.'s conduct[9] demonstrates that he had the intent to provide his father with inside information. Moran Sr. responds that the losses sustained by his venture into Chambers stock were over with, that his company was doing well, and that even if his company were to fold, he could have comfortably retired. Moran Jr. maintains that none of the actions raised by the SEC constitute any breach of securities law or in any way indicates he would act inappropriately to benefit his father's firm.

It is undisputed that the decision by Moran Sr. to invest in Chambers Development Company resulted in significant financial losses for Moran Sr.'s clients as well as his personal account. Shortly after an announcement in March 1992 that Chambers' net income was far less than had been previously reported, Moran Sr. began aggressively purchasing Chambers stock for his clients. By the end of 1992, Moran Sr., Moran Asset, and Moran Brokerage had become the largest or second largest outside shareholder of Chambers. While Moran Asset continued to purchase Chambers stock during 1992, the price of the stock steadily declined. At one point the price of Chamber stock fell approximately 60 percent. Because of the losses being sustained by Moran Sr.'s clients, Reddan testified that beginning in 1992, business began to fall off. Specifically he stated:

> [w]e no longer were beating the market, we were lagging the market and that was beginning to catch up. I think about it, 1990 we had a bad year because several factors, the credit crunch and this was the first wave of cable regulation. '91 we did fairly well, but in '92 we began to lag the market and cumulatively the business wasn't going that well.

(R. 109). In fact, Moran Sr. characterized Chambers as the worst investment experience of his entire business career and in terms of dollars, Chambers represented the largest loss that Moran Sr. had ever suffered on a single stock. Moran Sr. also conceded that one of the reasons that Moran Asset decreased its long position in Turner Broadcasting in 1993, was "because clients were leaving us" (R. 1299).

There is no question that Moran Jr. was aware of the problems the Chambers stock investment was causing for his father. Moran Jr. specifically testified that he had knowledge of his father's big investment in Chambers stock, and that Moran Sr. was suffering losses. Moran Jr. "knew that ... two things were occurring; one, that Chambers was not quite performing up to expectations, and I knew that, given several years of less-than-superior performance, [Moran Sr.] was losing clients" (R. 281). By the beginning of October 1993, Moran Jr. was cognizant of the losses Moran Sr. was sustaining owing to the Chambers stock investment.

Moran Sr. responds that while it is true that the Chambers stock was a bad investment, the bulk of the paper losses in Chambers occurred a full year before the Bell Atlantic merger. While in October 1993 the stock was not doing particularly well, the drop in price of Chambers had reached a plateau. In addition, the firms' financial condition in October 1993 was much better than a year earlier. The firms had no debt, and profits for the quarter ending September 1993 were up more than 60% from a year earlier. Finally, Moran Sr. testified that if he were to retire in October 1993 he could have lived at the same comfort level for the rest of his life. In short, Moran Sr. argues that it would be "ridiculous" to conclude that the losses sustained in Chambers stock had anything to do with his decision to reinvest in cable stocks.

After hearing all of the evidence and examining the documentary exhibits, the court

---

9. The court permitted the SEC to introduce evidence that Moran Jr. provided his father with confidential information from Salomon Brothers in violation of Salomon Brothers' regulation and other information which his father was not entitled to receive. *See,* Order dated October 30, 1995. The sole purpose that the court allowed this evidence was to the extent that it purported to show Moran Jr.'s state of mind and intent to communicate the material non-public information at issue in this case. *See, United States v. Zackson,* 6 F.3d 911, 921 (2d Cir.1993); Federal R.Evid. 404(b). The introduction of the evidence was not permitted for the purpose of demonstrating that Moran Jr. had a propensity to violate securities law, nor did the court make any such inference when it received this evidence.

concludes that the losses in Chambers did not put Moran Sr. in any dire position by October 1993. Undoubtedly Chambers was a bad investment causing Moran Sr.'s clients to suffer large monetary losses as the price of the stock plummeted. Certainly because of the losses that were incurred Moran Sr.'s business was negatively affected. However, the evidence is compelling that by October 1993, Moran Sr. had already experienced the worst of the Chambers fallout. While Moran Sr., like any other investor, would desire to pick a winner in the market, there was no special urgency created by the Chambers stock fallout for Moran Sr. to produce a successful stock pick. The court finds that Moran Sr. was in no worse position than any other analyst who seeks to recommend a stock that would significantly increase in value.

The SEC also maintains that Moran Jr. engaged in a pattern of deceptive conduct that indicates he would favor his father's firm even if it meant disclosing confidential material. In support of this assertion, the SEC claims that Moran Jr. was not forthright with Salomon Brothers regarding his directorships and outside business interests, that Moran Jr. through subterfuge allowed Moran Asset to listen in to the TCI conference call, and that Moran Jr. was reprimanded because he improperly sent his research publications to Moran Asset. The SEC asserts that this conduct demonstrates a manifest intent by Moran Jr. to provide special assistance to his father's firms. Moran Jr. counters that the incidents pointed to by the SEC do not even demonstrate wrongdoing on his part, and certainly do not establish an intent to violate the law in order to benefit his father. The court shall address each allegation in turn.

With respect to his position as a director and his trust accounts[10], the court finds that Moran Jr. did not initially know that he was placed on the board of directors but upon learning of his position, did inform Salomon Brothers about the directorships. Moran Sr. testified that he did not disclose to either of

his sons that he had appointed them to the director positions. The fact that Moran Jr. did not participate in running these companies supports the court's conclusion that he had no knowledge of his position. It is not likely that there would have been a need to forge Moran Jr.'s signature on resolutions, if he had been aware that he was on the board of directors. At trial, it was quite clear that the signatures on all the Directors' resolutions that purported to be of Moran Jr. were not genuine. The SEC did not dispute that the resolutions lacked Moran Jr.'s genuine signature and that they were signed without his permission or authority. Moreover, when Moran Jr. learned of his positions, he informed Salomon Brothers and subsequently resigned the positions.

Similarly, with respect to the trust accounts, Moran Sr. specifically confirmed that he did not disclose their existence to Moran Jr. or his other children who were also beneficiaries. Considering this testimony, the Court finds that Moran Jr. was not aware of these trust accounts and consequently, could not disclose his interest to Salomon Brothers. When the existence of these accounts was discovered, Salomon was notified by Moran Jr. and "Salomon Brothers approved [Moran Jr.] being a beneficiary of these trusts and just requested that confirmation statements be sent to Salomon Brothers" (R. 646). Therefore, with respect to the trust accounts and his position as a director, the court finds that the only reason Moran Jr. failed to disclose this information to Salomon Brothers was that he was unaware of his position and status. Hence, the court finds that these holdings do not demonstrate any intent on the part of Moran Jr. to benefit his father or father's firms.

Moran Jr. admits that while using Salomon's office telephone system, he allowed John Reddan to listen to analyst conference calls conducted by TCI after TCI had specifically excluded Reddan and Moran Asset from these calls. Reddan concurred that at his

---

**10.** The court finds no impropriety with respect to Moran Jr.'s interest in International Tel–Cel. The court credits Moran Jr.'s explanation that he "didn't realize the necessity of disclosing it, as [he] had no involvement in it other than owner-

ship interest" allocated to him by Moran Sr. (R. 351). Significantly, when Salomon Brothers was informed of Moran Jr.'s interest, the compliance department allowed Moran Jr. to maintain his interest in the company (R. 355; 648).

request Moran Jr. gave him access to the conference calls. Moreover, by his own testimony, Moran Jr. concedes that he made no attempt to inform TCI that he was engaging in this practice. In response, Moran Jr. maintains that there was no requirement that TCI be informed as to who was listening in on the calls. More, Moran Jr. attempts to support his conclusion that his actions do not constitute any wrongdoing by pointing out that he did not in any way attempt to conceal from Salomon Brothers that he was allowing Reddan to listen in on these conference calls.

While the court is of the view that Moran Jr.'s actions did not constitute either a violation of law or even Salomon Brothers' policy, Moran Jr.'s actions do demonstrate an intent to help his father's companies beyond any effort he would make for any other firm. While Moran Jr. may not have concealed his actions to Salomon Brothers, the fact that he would allow a member of his father's firms access to a conference call that his father's firm was specifically banned, clearly demonstrates an intent on the part of Moran Jr. to assist his father's firm where he could, even under questionable circumstances. The court finds that Moran Jr. concealed his actions from TCI and that there was no evidence that Moran Jr. ever gave such assistance to any other entity.

The SEC also claims that Moran Jr. was officially reprimanded by Salomon Brothers because he mailed copies of his research publications marked "Internal Use Only" to Moran Asset. Moran Jr. responds that the information contained in the memorandum was not confidential and that he was not reprimanded. As far as Moran Jr. understood, the meeting with the Salomon compliance department was "to advise him of certain aspects of his conduct that the firm—wished to bring to his attention" (R. 873).

The parties agree that on Wednesday October 11, 1993, at approximately 6:30 a.m., Moran Jr. faxed to Moran Asset a summary he prepared which contained his insights as to the proposed Bell Atlantic/TCI transaction (Exh. 5). The document was marked in several areas "For Internal Use Only." Moran Jr. never sought or received approval from anyone at Salomon Brothers to send the

document to Moran Asset. Sometime after Moran Jr. used the document to make a presentation at Salomon's morning meeting, the compliance department told Moran Jr. not to put the document on the First Call system, which would have distributed the document to the investment community, because the Salomon involvement in the merger was on an advisory basis. Despite being aware of the decision not to use the First Call system, Moran Jr. did not tell anyone at Salomon Brothers that he had already faxed the document to Moran Asset. When Salomon eventually learned of the fax, Moran Jr. had a meeting with Scribner, the Chief Compliance Officer for Salomon Brothers. At that meeting Moran Jr was told that "it was contrary to Firm policy for him to have sent "internal use only" material to persons outside of the Firm, and that he must not do it again" (Exh. 6). The SEC characterizes the meeting as a reprimand while Moran Jr. states that he "doesn't know if it qualifies as a reprimand or not" (R. 594). Moreover, Moran Jr. believed that the Internal Use Only designation was "a technical compliance procedure that was used very loosely in this business." *See,* Moran Jr. Post–Trial Brief at 22.

After evaluating all of the evidence, including the testimony of Scribner, the court finds that Moran Jr. was given a "reprimand." Scribner testified that the meeting and subsequent memo was "to advise him of certain aspects of his conduct that the firm wished to—bring to his attention" (R. 873). Scribner explained that the designation of "Internal Use Only" "is that the document on which the—on which that legend appears is not to be distributed outside the firm itself, that is to say, the document, not necessarily—not the information that the document contains" (R. 873). Indeed, other Salomon employees such as Meyercord and Dietze–Courage understood that such a designation meant that the document was not to be distributed to clients or anyone outside the firm (R. 900; Dietze–Courage Deposition, at 59). It is clear that from the tone of the memo regarding Scribner's conversation with Moran Jr. that Salomon Brothers was not pleased that Moran Jr. sent the memo to his

father. All of this evidence, coupled with the fact that Scribner warned Moran Jr. not to release such documents again, lead to the unmistakable conclusion that Moran Jr. engaged in a practice that violated Salomon policies in order to benefit his father. Further, there was no evidence that Moran Jr. faxed this document to any other outside parties, other than Moran Asset.

The court notes that the information contained in that memorandum was not confidential. Scribner agreed that there was "absolutely no prohibition for the sales force to discuss the contents of that document with the institutional clients of Salomon Brothers" and that "the prohibition as it stands is merely for the fact of faxing out the document itself rather than the information it contains" (R. 879). Accordingly, after reviewing each of the SEC's allegations regarding Moran Jr.'s conduct, the court finds that the evidence in this case, while not showing an intent on the part of Moran Jr. to violate the law in order to assist his father, nonetheless illustrates Moran Jr.'s willingness to provide information to his father, even if doing so is contrary to the established policies of Salomon Brothers or the wishes of his firm's clients.

### Events From October 3, 1993 to October 11, 1993

On October 3, 1993, Moran Jr. was officially brought "over the wall" by Salomon Brothers, meaning that he was made aware of the proposed merger between Bell Atlantic and TCI. According to Meyercord, the purpose of involving Moran Jr was to have him "meet with the company and to discuss how to tell the [merger] story ... to the investment community ... so that he could provide his insight and information on how to tell the story and best position the story to the market place" (R. 893). At that time Moran Jr. was told that "the announcement would come within a week to two weeks" (R. 437).

After being informed about the details of the proposed merger, Moran Jr. left on a previously scheduled business trip to San Francisco. On the night of Monday October 4, Moran Jr. placed two telephone calls from his hotel to the residence of Moran Sr. Upon his return from San Francisco, Moran

Jr. reviewed materials relating to the Bell Atlantic/TCI merger plan which he had received in San Francisco. Included in these materials were the details of the merger and an indication that its public announcement would be made in October 1993.

On the morning of October 6, 1993, Moran Jr. attended a meeting at Salomon where he received a full briefing regarding the transaction. During this meeting where Moran Jr. learned the details of the merger, a firm date for the merger's public announcement had not been set. Nonetheless, Moran Jr. was told by Meyercord that the announcement "was going to occur either at the end of the week or in the middle of the following week, and more likely the middle of the following week" (R. 671). Moran Jr. understood that the announcement date "would probably be the 13th, or certainly the 12th, 13th, or 14th" (R. 437). Moran Jr. also received a draft of the press release for the Bell Atlantic/TCI merger which indicated an unspecified announcement day of October 1993. In a telephone conversation that same day, Moran Jr. spoke to either his father or an employee of Moran Asset. Also on October 6, 1993, Furman Selz, a broker dealer issued a report which opined that TCI might reacquire Liberty. Specifically it stated: "To date investing alongside Malone has proved to be profitable. We suspect Liberty might be bought back by TCI. This would make TCI more attractive to a regional Bell investor." In fact, Bell Atlantic sought to acquire Liberty as well as TCI and as a result, TCI and Liberty entered into merger negotiations.

On October 7, the Wall Street Journal published an article entitled "TCI Reported in Talks to Buy Liberty Media" (Exh. 11). In that Wall Street Journal article a Furman Selz analyst speculated that such a merger might "attract a huge investment from a regional Bell phone company." In addition to several brief phone calls between Moran Jr.'s office and Moran Asset as well as Moran Sr.'s home, there was one call where Moran Jr. spoke to Moran Sr. for approximately 43 minutes (R. 720; Exh. 7). Although Moran Jr. remembered that he spoke with Moran Jr. during that period of time, he

said "I can't recall the exact specifics, but I believe [Moran Sr.] mentioned something to the effect of Infinity Broadcasting and/or Westwood One during that phone conversation and we talked about that, but I can't remember the specifics of that conversation very well." (R. 427). Moran Jr. further testified that he did not believe there was any discussion of the rumor regarding the rumored TCI/Liberty merger, or the Wall Street Journal article.

Moran Sr. agreed that he had in fact spoken to Moran Jr. during the 43 minute phone conversation. Relative to that conversation, Moran Sr. stated: "To the best of my recollection, my recollection having been helped by two factors, I now believe that I spoke to him about Infinity Broadcasting, and I believe I spoke to him about a party that we were going to have for family and friends at our house sometime in the near future" (R. 1198). Moran Sr. identified the "two factors" stating:

> Well, I studied our buy and sell orders because of this case, and I noticed that we started buying Infinity for the first time I believe it was on October 5th, and I knew Fred followed Infinity, or followed it, and so I believe and I kind of now do recall it, that I talked to him about Infinity, what I thought about it, asked him what he thought about it and so on. The other situation was that, having studied the telephone records and spoken to my wife, I believe—and think it's—let me see—yes, which has to do with my home, perhaps both of those calls were calls to her, or from her—let me see, Frederick A.—yes, that's my wife calling Fred at his office because I had told her to because we were—he wanted her to talk to him about this party that we were going to have, and it had to do with his then fiancee, Michelle, singing at the party and Fred and Michelle coming to the party.

(R. 1198–1199). Moran Sr. also remembered that he did not discuss the rumors regarding the TCI/Liberty merger or the Wall Street Journal Article. October 7, represented the last documented phone conversations between Moran Sr. and Moran Jr. until Monday October 11.

On Friday, October 8, TCI and Liberty announced that they had agreed in principle to a combination of the two companies. An effect of the combination is that John Malone whose holdings in Liberty Stock were valued in excess of $600 million, while his holdings in TCI were $15 million, was diluting his percentage of holdings invested in programming stocks by allocating that wealth to a cable operator. It is undisputed that Moran Sr. did not purchase any TCI or Liberty stock on October 8. In a morning meeting note authored by Reddan, Moran Brokerage reported that "we believe Liberty's real motive is to use TCI's balance sheet to acquire Paramount" (Moran Sr. Exh. AC). This represented the speculation on Wall Street with regard the reasoning behind the merger. Moran Sr. testified that on October 8, he "had no opinion because I really hadn't focused on it" (R. 1482). There was no documented contact between Fred Sr. and Fred Jr. on October 8, 1993.

On Saturday, October 9, 1993, Moran Jr. attended a meeting at Bell Atlantic's headquarters in Philadelphia with co-workers from Salomon Brothers and personnel from Bell Atlantic's Investor Relations Department. Moran Jr.'s purpose in attending the meeting was to discuss the "spin" that would be put on the merger, so as to create the most favorable reaction to the merger from the investment community (R. 912–13). As part of this plan, Bell Atlantic arranged to give advance notice to important members of the investment community "providing notification of a special Bell Atlantic meeting at 8:00 a.m. the following day" through a "blast fax" (Exh. 1). Additionally, it was decided that the Bell's investor relations staff would make phone calls to individual analysts in order to demonstrate the significance of the announcement.

During the weekend of October 9–10, Moran Sr. claims that he began to focus "on what was happening with TCI and Liberty" (R. 1485). After speaking with his wife on October 9th about the possibility of investing in cable stocks, on Sunday October 10th, Moran Sr. telephoned Reddan. Moran Sr. stated that he did not agree with Reddan's view that TCI was acquiring Liberty to help Lib-

erty in its effort to back an acquisition of Paramount. Stating that "my concept was that there were many easier ways to accomplish that [backing of the Paramount acquisition] without having John Malone move all of his wealth from cable—from programming to cable, and I recited the various ways to John [Reddan] that could have been done," Moran Sr. gave his assessment to Reddan (R. 1487). Reddan testified that "at the outset of the conversation I did not agree with him. By the end of the conversation I came around to agree that it represented an endorsement of Telecommunications, Inc. by John Malone and that I thought we should recommend only Telecommunications, Inc. and Liberty Media and we should not recommend other cable television operator stocks or invest in them" (R. 132–33).

Moran Sr. explained to Reddan that beyond Liberty and TCI, the action "was an endorsement of John Malone of the cable TV business and therefore all of the stocks" (R. 1488). Accordingly, Moran Sr. told Reddan that he "wanted to buy all the cable companies and that we were not going to sit by while Malone moved into cable and miss what was happening in the area that had built our reputation and was our forte" (R. 1489). It was the belief of Moran Sr., this was action constituted the appropriate response to Malone's apparent course of conduct. Moran Sr. further explained that "it was a case of following the substance of what John Malone was doing and not limiting [Moran Asset] to the limitation [Malone] had placed on himself of investing only in TCI and Liberty, just like we didn't buy Liberty when he moved into Liberty" (R. 1489). As a result of his analysis, Moran Sr. detailed to Reddan his strategy for buying cable stocks. He testified that "the strategy was to buy almost all the cable TV companies and to move quickly before the rest of Wall Street caught on to what we were doing, because you must understand that everybody was following John Malone, and the logic of my scenario was plain and clear in my opinion, and everybody would end up doing what we were doing, so we wanted to move quickly" (R. 1489). Reddan, while agreeing that there was a basis to buy into TCI and Liberty, urged more caution.

On Monday October 11, 1995 Moran Sr. prepared a written plan to purchase stock in Liberty, TCI and other cable companies for client accounts so that each client would have 25% of its portfolio invested in cable stock (Moran Sr. Exh. W). Prior to the opening of the market, Moran Sr. directed his traders to purchase, through Moran Asset and Moran Brokerage, stock in TCI, Liberty, as well as other cable companies. According to Reddan, Moran Sr. announced to the staff that he had changed his position on cable television operator stocks, and summarized his reasons for doing so. Although Moran Sr. was adamant about his position, Reddan testified that, "there was a general feeling that we should go—everybody was urging caution, and I think that was the feeling of the people in the meeting" (R. 135). In fact, the item in the morning meeting note relating to cable was specifically caption "Fred Moran's Cable TV Industry Comments" because Reddan, who usually co-authored the morning meeting notes, did not agree in total with Moran Sr.'s view. With respect to the Cable TV industry the morning meeting note stated:

> Through the merger of TCI and Liberty Media, John Malone has signaled his plans to transfer the vast majority of his personal wealth, estimated a $700 million, from a company that is roughly half cable TV and half programming, to a company that is very predominantly cable.... Despite the negative of poor government and poor customer relations, the economics of this business are so powerful that they will overshadow the regulatory negative.

(Exh. 41). The morning meeting note was distributed to all of Moran Brokerage's institutional clients. At the opening of the market, Fred Sr. began aggressively purchasing cable stocks, including Liberty and TCI. These stocks were bought for both Moran Sr.'s client accounts and Moran Sr.'s personal and family accounts. His traders were told to be active buyers but don't "chase" stocks which would push the prices higher.

Later on October 11, Moran Asset's Investment Policy Committee ("IPC") held a meeting so that views could be exchanged

with respect to the change in strategy. According to Reddan, the purpose "was to talk about the decision to re-recommend the cable television stocks and to invest in those stocks" (R. 143). At the meeting, the general recommendations to Moran Sr. was to adopt a go slow approach and several people wished to engage in more research. The conclusion of the IPC meeting was that "[w]e were going to investigate further change in the cable television industry. We were going to talk to other companies in the cable industry and other investors in cable television" (R. 146). There was no change, however, in the way the stocks were being purchased[11].

At approximately 3:17 p.m. on October 11, Moran Sr. faxed to Moran Jr. that day's Moran Brokerage Morning Meeting note. Moreover, during the afternoon, Moran Sr. and Moran Jr. spoke via telephone with respect to Moran Sr.'s analysis of cable stocks. Moran Jr.'s recollection of the conversation was that he "was the listener in that conversation. That day [Moran Sr.] called me or I called him and he told me about his change of position on the cable stocks, and basically all I said was your points are well presented or something to that effect" (R. 725). Moran Jr. claimed that he never mentioned Bell Atlantic at any time during the conversation and that the reason he did not respond to Moran Sr. inquiry with a "no comment" was because that "could be a signal to [Moran Sr.] that I was working on something, and I purposely avoided signaling anything to him in any way" (R. 725–26). Similarly, Moran Sr. recalled that the conversation regarding the morning meeting note was brief and that Moran Jr. "just said he thought it was well done and that the institutions who [Moran Sr.] sent it to should think well of it, or something to that effect" (R. 1347). While Moran Jr. did not have specific knowledge that Moran Sr.'s new strategy of his father included buying TCI, he testified that "my assumption was that he was probably buying TCI" (R. 459).

On the evening of Tuesday, October 12, Moran Jr. concedes that he spoke to an employee of Moran Asset with respect to the Bell Atlantic proposed merger. Moran Jr. testified that he could not remember if he spoke to Kevin Martin or Brian Kelly, and stated:

> What happened is these two gentlemen answered the telephone when I was trying to reach my father and one of them asked me, you know, is something going on, and I said to one of them, I don't remember which one specifically, but I said to them there is, you know, a big deal that's going to be announced tomorrow at the merger of Bell Atlantic and TCI.

(R. 499–500). At the time he disseminated this information, Moran Jr. opined that there was no need to caution either Martin or Kelly because he felt that the information was no longer confidential. Moran Jr. explained that:

> The stock market had already closed, the Wall Street Journal and New York Times were being apprised of the transaction as were the rating agencies, and the announcement would come before the opening of trading the next day, so there would be no way of acting on the information anyway. Plus, they would understand that as professionals in the industry.

(R. 502).

Having failed to reach his father, sometime between 6:30 and 7:00 p.m., Moran Jr. placed a telephone call to Reddan. According to Reddan, the substance of the conversation was that Moran Jr. "told [Reddan] that Bell—there was going to be an announcement in the morning that Bell Atlantic was going to take over Telecommunications, Inc. He asked me if I had heard" (R. 146–47). While Reddan had received a fax from Bell Atlantic which told of an upcoming announcement the next morning, the fax did not include any details such as what the announcement was going to pertain to or if any other parties were involved. Reddan continued, stating that he and Moran Jr. talked a little bit about that, and then Moran Jr. asked me

---

**11.** Although Reddan advocated the "go slow approach," he was not surprised that it was not heeded by Moran Sr. of whom he stated "Fred has a mentality to jump in with both feet and act decisively" (R. 802). Indeed, Reddan testified that he had observed act this way "half a dozen or a dozen times over the course of my ten years" (R. 803).

if I knew where his father was" (R. 147). Moran Jr. recalled that he briefed Reddan "on some of the details of the merger at that time" (R. 518). In addition, Moran Jr. left a message on Moran Sr.'s answering machine stating that "there will be a big announcement tomorrow morning essentially creating a merger between Bell Atlantic and TCI" (R. 517).

The reason Moran Jr. believed that the information he disclosed in the evening of October 12 was public was based on his assertion that at the October 9 meeting it was discussed that top investors and the newspapers were to be advised of the transaction prior to the official announcement. When asked who said that the merger was going to be revealed before the public announcement, Moran Jr. stated:

It was discussed that in general notifying the general public the night of Tuesday, October 12, 1993, that was discussed between Peter Crawford, Kevin Tarrant, Wendy Dietze, Ed Meyercord, Ray Ligouri and myself at the October 12—at the October 9th, 1993 meeting at Bell Atlantic headquarters. Whether they specifically said individual X will notify the Wall Street Journal, I don't remember us discussing that, but they said we will be apprising the investment community in general, which includes the two biggest newspapers.

(R. 506–07). To contradict this assertion by Moran Jr., the SEC called to the stand four of the five individuals Moran Jr. named and offered the deposition of the fifth, and each contradicted Moran Jr.'s recollection.

Specifically, Crawford of Bell Atlantic testified that "there was absolutely no discussion about preannouncing this transaction to any newspapers" (R. 1045). In fact, Crawford continued that Bell Atlantic was "very concerned that there would be no leakage, whether to the investment community or to the newspapers or any other community, for that matter, of the terms and conditions or the announcement itself prior to 7:30 in the morning on the 13th" (R. 1046). After a stipulation that Tarrant would testify on direct to the same facts as Crawford, on redirect Tarrant stated that the policy with respect to media inquiries made on October 12,

"would be neither confirm nor deny rumors or choose to comment on that" (R. 1120, 1128). Tarrant stated that the policy was the same until the public announcement on October 13. Katherine Dietze–Courage of Salomon Brothers testified that she did not learn of any Salomon Brothers employees who had disseminated information regarding the merger or disclosed the identities of the companies (Deposition of Katherine Dietze–Courage, at 63). Meyercord and Ligouri of Salomon Brothers each told the court that their understanding of the policies concerning disclosure of the merger details was that public dissemination would take place in the morning on October 13 and that neither of them contacted the newspapers with this information, nor knew of anyone who did so. Further undermining the claim that the information was public in the evening of October 12 is documentary evidence that contradicts Moran Jr.'s recollection. In the story published by the Wall Street Journal on October 13, it was reported that TCI and Bell Atlantic officials would not comment on the rumored merger (Moran Sr. Exh. AL). Moreover, Moran Jr.'s own exhibit, a chronology of events prepared by Bell Atlantic states:

Calls start coming in to media relations and other Bell Atlantic employees from the New York Times and the Wall Street Journal news reporters indicating that they have some information about the deal and asking for more. Bell Atlantic neither confirms nor denies per routine corporate policy.

(Moran Jr. Exh. AS). Even Reddan, who had already received the blast fax; testified before the court that he did not know the identities of all the parties and the details until he was told by Moran Jr. Thus, the issue of whether the information Moran Jr. passed to Reddan and Moran Asset was still confidential is vehemently contested.

In resolving this factual dispute, the court has examined all of the relevant testimony and documentary evidence. The court finds that the merger details relayed by Moran Jr. on the evening of October 12 were still confidential non-public information. Whether Moran Jr. merely misunderstood the timing of disclosure or intentionally neglected to

follow the guidelines, the evidence is overwhelming that the policy was not to disclose the details of the merger to the public as a whole, including the newspapers, until October 13. Every person named by Moran Jr. contradicted his account of the meeting and Moran Jr. was never able to tell the court who specifically authorized disclosure to the public at large on October 12. Therefore, the court is constrained to find that by engaging in these conversations, Moran Jr. disclosed confidential, non-public information [12].

At 6:36 a.m. on October 13, Moran Jr. sent by fax to Moran Asset a summary of the proposed Bell Atlantic/TCI transaction that he had helped to prepare [13] (R. 153, 464; Exh. 5). This was the same summary Moran Jr. used at Salomon's morning meeting on October 13, to make a presentation. Reddan found this document helpful in interpreting the Bell Atlantic/TCI deal because "it was Fred's [Moran Jr.] analysis of the transaction, and . . . took that as a starting point to do our own analysis" (R. 155). Later that morning, but before the market opened, Bell Atlantic, TCI and Liberty announced their agreement in principle to merge. On that day, TCI Class A stock closed up $3.00 per share and Liberty Class A stock rose $2.625 per share (Exh. 24).

### The Claim under Section 206(1) and (2) of the Advisers Act

By the morning of October 11, 1993, Moran Sr. had developed a game plan for the cable stock purchases. The plan was to have Moran Asset's clients invest 25% of their portfolio in cable stocks, including a 3.75 percent weighting in Liberty stock (Moran Sr. Exh. W). Additionally, the strategy also called for Moran Sr.'s family accounts to be invested in the smaller cable stocks, which did not include the purchase of any Liberty, TCI, or Comcast stock. Before the market opened on October 11 Moran Sr. advised Frank Poli, Moran Asset's head trader, to purchase cable stocks for his managed accounts. Neither the game plan, nor Moran Sr. personally, indicated to Poli which particular accounts to allocate what stock. In what was one of Moran Asset's busiest trading days ever, among other securities, approximately 169,200 shares of Liberty Class A stock was purchased at an average acquisition cost of $26.256 per share.

Shortly before the market closed on October 11, as Poli began to allocate the stocks to various client accounts, he realized that Moran Assets largest managed account, Louisiana State Teachers Fund ("LSTF") which had a small cap portfolio, could not hold TCI, Liberty, Comcast, and Viacom stock because those stocks' respective market caps exceeded LSTF's cap restrictions. Although Poli assumed that Moran Sr. had also forgotten about the cap restriction, Moran Sr. testified that he knew that Poli was aware of the market cap restriction on LSTF and did not think that Poli was buying the larger stock for the LSTF account. Because of Poli's error, on the evening of October 11, all of the small cap cable stocks originally purchased for the Moran personal accounts were allocated to LSTF and the larger cap stocks such as TCI, Liberty, Comcast, and Viacom, were allocated to other client accounts.

During the early evening of October 11, Moran Sr. assisted Poli by filling out the allocation sheets for his family and personal accounts instead of the smaller stocks as described in the game plan. Because of the market restrictions of LSTF, to which Moran Asset was contractually obligated to adhere [14], there were 80,774 shares of TCI which were allocated to Moran Brokerage's error account. According to Moran Sr., at the time the sheets were filled out, both he and Poli believed that too many shares of Liberty, TCI, and Comcast had been purchased to be able to allocate all of the shares

---

**12.** As will be discussed *infra,* these disclosures do not constitute a violation of law.

**13.** The summary was marked "For Internal Use Only" and when Salomon learned that Moran Jr. had faxed the document to Moran Asset, Moran Jr. was told that "it was contrary to Firm policy for him to have sent "internal use only" material to persons outside the firm, he must not do so again," and his father's firm should not receive any better treatment than any other firm would ordinarily receive (Exh. 6).

**14.** At the time of the allocation, there was nobody at LSTF who had the authority to waive the guidelines of LSTF (Deposition of Netterville and Holbeing).

into client accounts. Later that evening, Poli completed the client allocations pursuant to Moran Sr.'s instructions to have the client portfolios invested with weightings of approximately 8% of TCI, Liberty, and Comcast. This represented a modification of the original game plan which had called for smaller allocations. There appears to be a conflict as to whether Moran Sr. reviewed or signed the Liberty stock allocation sheet. However, considering that Moran Sr. does not explicitly deny that he signed the allocation sheet and Poli identified the mark as Moran Sr.'s signature (R. 979–80, 983), the court finds that Moran Sr. did approve the allocation sheet.

Despite Moran Sr.'s and Poli's belief to the contrary, Moran Asset had not purchased enough Liberty stock to cover an 8 percent allocation of the stock to its client accounts. Moran Sr. and Poli made the same misjudgment with respect to Comcast stocks. Although they believed that there was enough of the stock to be allocated to the client accounts at an 8% weighting, Moran Asset was in fact short. As a result of this erroneous calculation, on October 12 Moran Asset purchased 15,430 additional shares of Liberty to make up for the shortage in it's client accounts. On that day, Liberty stock had an average price of $26.875. That price was 0.619% per share higher than the Liberty stock price the day before, which was allocated to Moran Jr.'s personal and family accounts. Similarly, 19,000 shares of Comcast had to be purchased to achieve the desired weightings. Unlike Liberty, the price of Comcast on October 12 was lower than the day before. Accordingly, Moran Asset's clients were able to obtain Comcast stock at a cheaper price than the day before. Because of the price difference between the price of Liberty on October 11, which was allocated to Moran Sr.'s personal accounts, and the price of Liberty on October 12, Moran Asset's clients paid a total of approximately $7000 more [15] than they would have if enough stock been purchased on October 11.

## The Failure to Amend Form ADV and Form BD

On December 1, 1991, Moran Sr.'s wife Joan and two sons, Moran Jr. and Clayton Moran, became directors of Moran Asset (R. 1218; Exh. 80). They were elected by Moran Sr., who at the time was the sole shareholder of the company. Moran Jr. and Clayton were also made directors of Moran Brokerage by Moran Sr. Although Moran Sr. initially thought he had informed his sons that they had been made directors of the two companies, he later realized that he did not tell them. Moran Sr. testified that his "recollection was that at some point I had told [Moran Jr.] and his brother Clay, I might have told them that they—that I had made them directors, but that was rather vague in my mind, and I didn't have much confidence in that" (R. 1221). Later when he was told by his sons that he had not so informed them, Moran Sr. agreed that he did not tell his sons that he had made them directors.

From December 1991 to March 1994 the companies failed to disclose on either their Form ADV or Form BD that Moran Sr.'s wife or sons were directors of Moran Asset and Moran Brokerage (R. 1233–34; Exhs. 72, 73, 74). Moreover, although the Form ADV was amended in March 1994 to include his wife as a director of Moran Asset, Moran Sr. did not include his sons as directors of Moran Asset until May 1994. Moran Brokerage's Form BD was never amended. Moran Sr. signed the amendments of the Moran Asset's Form ADV. Each time he signed the amendments Moran Sr. swore to the following:

> The undersigned, being first duly sworn, deposes and says that he has executed this form on behalf of, and with the authority of, said applicant. The undersigned and applicant represent that the information and statements contained herein, including exhibits attached hereto and other information filed herewith, all which are made part hereof, are current, true and complete. The undersigned and applicant fur-

---

15. Moran Sr. has offered to reimburse the clients who were affected for the difference between the price they paid on October 12 and the price Moran Asset paid on the 15,430 shares of Liberty that were allocated to his personal, family, and firm accounts on October 11.

ther represent that to the extent any information previously submitted is not amended, such information is currently accurate and complete.

(R. 1225–26; Exhs. 71–73). On March 18, 1994, Moran Asset's Form ADV was amended to include Joan Moran as a director but Moran Sr. sons were still not included on the document, despite their status as directors. Similarly, Moran Sr. elected Moran Jr. and Clayton Moran to director positions of Moran Brokerage. However, although they were elected directors, Moran Jr. and Clayton were never included in any amendments to Moran Brokerage Form BD (Exh. 77–79).

According to Moran Sr. the advisement forms were prepared by Frank Squeo, who was told around December 1991 by Moran Sr. that Moran Jr. and Clayton Moran were made directors of Moran Asset. In addition, Moran Sr. testified that there were several different occasions where he found that Squeo had made errors regarding the Form ADVs. At the discovery of these errors, Moran Sr. "told him that these were errors and we could not afford to and I didn't want to have any errors in our ADVs ever, and I told him to make sure that he didn't make errors again and to correct the forms immediately" (R. 1235). During that the time there were several corporate resolutions which in which Moran Jr.'s name was signed without his knowledge or consent. Although Moran Sr. did not remember with specificity that he, himself, had signed those documents, he testified it was possible that he did (R. 1239). Moran Sr. never made any allegations that the signatures on the various cooperate resolutions were not his genuine signature. With respect to the other signatures that appeared in the corporate resolutions, Moran Sr. claimed that did not know how Moran Jr.'s purported signature came to appear on the resolutions.[16]

Although it was undisputed that his wife and sons were not listed on the Form ADVs and Form BDs, Moran Sr. claims that the omission was the result of an "inadvertent administrative error" with no attempt to defraud anyone (R. 1561). Moran Sr. added that because of Clayton and Moran Jr.'s educational background and experience in the field of securities, their omission actually hurt Moran Asset and Brokerage because they would have added to the firms' credibility (R. 1561). In its promotional materials, Moran Asset was advertised as being an employee owned business and Moran Sr.'s sons were never disclosed as directors (R. 1570–71; Exh. 87–88).

## CONCLUSIONS OF LAW [17]

This case presents four distinct issues to be resolved. Initially, the court must determine the proper standard of proof governing the case. The SEC maintains that the preponderance of the evidence standard, which governs the majority of civil trials, is the appropriate standard. Defendants respond that because of the penalties they face and the fact that the case is wholly circumstantial, the SEC should have to prove its case by the more exacting standard of clear and convincing evidence. After making this determination, the court will apply the standard and determine if the three allegations put forward by plaintiff have been sufficiently proved.

### A.

The court must first determine the proper standard of proof. There is no doubt that in a private securities action, the correct standard of proof is preponderance of the evidence. *See e.g., Herman & MacLean v. Huddleston,* 459 U.S. 375, 390–91, 103 S.Ct. 683, 691–92, 74 L.Ed.2d 548 (1983) (reversing the circuit court's ruling that clear and convincing standard should be applied to private securities actions). Defendants, however, maintain that because they are subjected to money damages, an injunction, and loss of livelihood in this wholly circumstantial case, the higher standard proof, clear and convinc-

---

16. After Moran Jr. and Clayton Moran learned during the course of the SEC investigation that they had been elected as directors Moran Asset and Moran Brokerage, they ratified all prior acts and resolutions of the respective boards (Exh. 117).

17. Any conclusion contained within this section that also constitutes a factual determination should be deemed a finding of fact.

ing evidence, is necessitated. Further, defendants attempt to distinguish this action from *Huddleston* by pointing out that this is not a private action. Plaintiff responds that applying the clear and convincing standard would be unprecedented and represent a deviation from current law.

■ Where Congress has not prescribed the appropriate standard of proof and the Constitution does not dictate a particular standard, the judiciary is required to make such a determination. *Steadman v. SEC,* 450 U.S. 91, 95, 101 S.Ct. 999, 1004, 67 L.Ed.2d 69 (1981); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 749, 95 S.Ct. 1917, 1931–32, 44 L.Ed.2d 539 (1975) (until Congress acts, causes of action under Rule 10b–5 must be judicially determined); *Woodby v. INS,* 385 U.S. 276, 284, 87 S.Ct. 483, 487, 17 L.Ed.2d 362 (1966).[18] Since there is no Constitutional or legislatively established standard for this type of case, the court must make the determination. For the following reasons, the court finds that the appropriate standard of proof in this securities enforcement action is preponderance of the evidence.

■ In the vast majority of civil suits the plaintiff must prove its case by a preponderance of the evidence. *Huddleston,* 459 U.S. at 387, 103 S.Ct. at 689–90; *Addington v. Texas,* 441 U.S. 418, 423, 99 S.Ct. 1804, 1807–1808, 60 L.Ed.2d 323 (1979). In the specific area of securities, the Supreme Court has established that the preponderance of the evidence standard governs actions brought by the SEC to establish fraud under § 17(a) of 15 U.S.C. § 77q(a) (The Securities Act of 1933), as well as in SEC administrative proceedings. *See, Steadman,* 450 U.S. at 96, 101 S.Ct. at 1005 ("For Commission disciplinary proceedings initiated pursuant to 15 U.S.C.

§ 80a–9(b) and § 80b–3(f), we conclude that Congress has spoken, and has said that the preponderance-of-the-evidence standard should be applied."); *SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 355, 64 S.Ct. 120, 125, 88 L.Ed. 88 (1943) (preponderance of the evidence standard will establish the case under the 1933 Act). Of course as previously stated, in a private securities action, the Supreme Court has determined that the standard of proof is preponderance of the evidence. *Huddleston,* 459 U.S. at 390–91, 103 S.Ct. at 691–92. Moreover, although as defendants point out the standard for proof in civil fraud actions at common law was clear and convincing evidence, the Supreme Court has repeatedly noted that common law fraud doctrines are inapplicable with regard to the anti-fraud provisions of the securities law. *Huddleston,* 459 U.S. at 389, 103 S.Ct. at 691 ("Moreover, the anti-fraud provisions of the securities laws are not coextensive with common-law doctrines of fraud."); *Blue Chip Stamps,* 421 U.S. at 744–45, 95 S.Ct. at 1929–30 ("the typical fact situation in which the classic tort of misrepresentation and deceit evolved was light years away from the world of commercial transactions to which Rule 10b–5 is applicable."); *SEC v. Capital Gains Research Bureau Inc.,* 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963) (recognizing that common-law doctrines of fraud which developed around transactions involving tangible wealth "are ill suited to the sale of such intangibles as advice and securities"). The majority of lower courts which have addressed this issue have determined that in civil enforcement actions the proper standard of proof is preponderance of the evidence. *See e.g., SEC v. Savoy Industries,* 587 F.2d 1149, 1168–69 (D.C.Cir.1978); *SEC v. Hasho,* 784 F.Supp. 1059, 1106 (S.D.N.Y.

---

**18.** While Congress has not spoken directly to the issue, it is noteworthy that the legislative history behind the Insider Trading Sanction Act of 1984 ("ITSA") indicates Congressional approval for the preponderance standard for enforcement actions brought under Rule 10b–5 cases. The House of Representatives Report on ITSA stated that:

> The Supreme Court has expressly approved of the preponderance of the evidence standard in governmental civil penalty suits. The civil penalty proposed here is distinct in nature

from those types of judicial action on which higher proof standards have been imposed. The Committee believes that, since the bill provides a new sanction, and makes no change of the underlying law, no additional language is required in the statute to express the intent of Congress that the preponderance of the evidence standard be applied to penalty actions brought under the legislation.

H.R.Rep. No. 376, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Admin.News 2274, 2282.

1992); *SEC v. Tome,* 638 F.Supp. 596, 620 n. 45 (S.D.N.Y.1986), *aff'd,* 833 F.2d 1086 (2d Cir.1987), *cert. denied,* 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988). In light of significant amount of precedent concerning securities actions, it would only be in the rare case where the traditional preponderance of the evidence burden would be replaced with the stricter clear and convincing evidence standard.

Historically, there are relatively few areas of the law which impose upon the plaintiff the burden of proving its case by clear and convincing evidence. Those examples are limited to cases in which the defendant faces a judgement which could potentially impose penalties such as loss of liberty, deportation, termination of parental rights, or deprivation of ability to engage in ones livelihood. *See e.g., Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (proceeding to terminate parental rights); *Addington v. Texas,* 441 U.S. at 427, 99 S.Ct. at 1810 (due process requires that in a commitment proceeding the state must "justify confinement by proof more substantial than a mere preponderance of the evidence"); *Woodby v. INS,* 385 U.S. at 285–86, 87 S.Ct. at 487–88 (deportation proceedings governed by clear and convincing standard); *In re Ryder,* 263 F.Supp. 360, 361 (E.D.Va.), *aff'd,* 381 F.2d 713 (4th Cir.1967) (disbarment proceeding governed by clear and convincing standard).

In the context of securities litigation, the D.C. Circuit has stated that in an action brought by the SEC seeking revocation of a defendant's broker and dealer registration, expulsion from membership in National Association of Securities Dealers, and barring association with any other broker or dealer, the clear and convincing standard would govern. *Collins Securities Corp. v. SEC,* 562 F.2d 820, 825 (D.C.Cir.1977); *see also, Whitney v. SEC,* 604 F.2d 676, 680 (D.C.Cir.1979) (clear and convincing standard appropriate in action brought by SEC seeking to suspend the defendant from association with any securities brokers and dealers for nine months). However, it is important to note that the D.C. Circuit expressly limited its holding to the facts of the case before it, which involved the sanction of deprivation of livelihood. *Collins,* 562 F.2d at 825 fn. 32. Thus, the D.C. Circuit will apply the higher standard for a sanction of loss of livelihood, however, the clear and convincing burden of proof has not been expanded to other situations. Indeed, even the imposition of severe civil sanctions have often been permitted after proof by a preponderance of the evidence. *See e.g., United States v. Regan,* 232 U.S. 37, 48–49, 34 S.Ct. 213, 217, 58 L.Ed. 494 (1914) (proof by a preponderance of the evidence suffices in civil suits involving proof of acts that expose a party to criminal prosecution).

In making their claim that the clear and convincing standard is appropriate to the case at bar, defendants allege that the relief sought in this case can be likened to that in *Collins.* They state that the arguments and rationale of *Whitney* and *Collins* remain compelling post-*Steadman* because a member of the securities industry who is found liable of violations of § 10(b) or Rule 10b–5 will effectively be deprived of his livelihood. Because there is significant difference between a defendant who will in fact be deprived of his livelihood and one who will "effectively" be deprived, the court finds defendants' argument to be without merit.

In this case, the SEC seeks relief in the form of an injunction to enjoin the defendants from engaging in future security violations, disgorgement of illegally obtained profits, and civil penalties. While these are undeniably harsh sanctions, there is a great deal of difference between enjoining a party from engaging in illegal activity and revoking their license to engage in their business. Judge Henry Friendly aptly discussed the differences stating:

> These actions [disciplinary actions] share with damage suits the quality of visiting serious consequences on past conduct, even though they also have a remedial effect. They thus differ from injunctive proceedings, the object which is solely to prevent threatened future harm, although unlawful conduct is necessary—if not always sufficient—to demonstrate the reality of this threat.

*Arthur Lipper Corp. v. SEC,* 547 F.2d 171, 180–81 (2d Cir.1976), *cert. denied,* 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978).

"An injunction ... does not ipso facto involve a deprivation of livelihood, and as a practical matter, would not be nearly as extensive an impairment to [the party] as revocation would be to a broker-dealer." *Savoy*, 587 F.2d at 1169. Although the distinction between actual loss of livelihood and "effective" loss may seem minor, in reality there is a world of difference between the two. To accept defendants' argument would mean that virtually any civil case would need be tried under the clear and convincing standard if the defendant could show that the result of the imposition of the requested judicial action would ultimately impair the defendant's ability to pursue their livelihood. Even a simple case for money damages would be affected if the defendant could show that to lose the amount of money being asked for would "effectively" put him out of business. This court declines to create such a standard. The well established law is that the preponderance of the evidence standard is sufficient to govern a civil action unless the remedy sought would, *in fact*, deprive the defendants the ability to continue to pursue his livelihood such as disbarment or revocation of another such licence. Here, no such remedy is being sought.

 Lastly, defendants maintain that the proper standard of proof is clear and convincing evidence partly because the SEC proof is wholly circumstantial. The court finds that this is insufficient reason to apply the clear and convincing standard. The presentation of circumstantial evidence is a well accepted method for the plaintiff to prove his case. The Supreme Court has noted that "circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 11, 5 L.Ed.2d 20 (1960); *Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, 508 n. 17, 77 S.Ct. 443, 449 n. 17, 1 L.Ed.2d 493 (1957). In the context of the standard of proof, it has been stated that "[i]f anything, the difficulty of proving the defendant's state of mind supports a lower standard of proof. In any event, we have noted elsewhere that circumstantial evidence can be more than sufficient." *Huddleston*, 459 U.S. at 391 n. 30, 103 S.Ct. at 692 n. 30; *see*

*also, SEC v. Burns*, 816 F.2d 471, 474 (9th Cir.1987) (insider trading allegations are "often based on inferences from circumstantial evidence."); *SEC v. Singer*, 786 F.Supp. 1158, 1164 (S.D.N.Y.1992) ("proof of insider trading can well be made through an inference form circumstantial evidence and not solely upon a direct testimonial confession."); *SEC v. Musella*, 678 F.Supp. 1060, 1062–63 (S.D.N.Y.1988). Thus, the fact that this is an action based upon circumstantial evidence does not in any way necessitate a higher standard of proof. Accordingly, the court finds that this case shall be governed by the preponderance of the evidence standard.

### B.

The court next turns to the allegations of insider trading brought against each of the defendants. The SEC alleges that Moran Jr. disclosed material non-public confidential information to Moran Sr., who then purchased stock as a result of that information. There are several possible scenarios proposed by the SEC that it claims constitutes insider trading. Initially, the SEC argues that sometime during the October 7, 1993 forty minute phone call between Moran Jr. and Sr., Moran Jr. disclosed to Moran Sr. material non-public information regarding the merger. The SEC further maintains that the evidence supports its theory that Moran Jr. "tipped" Moran Sr. or relayed additional material non-public information from a public phone during the weekend October 9–10. More, the SEC contends that Moran Jr.'s statements to Moran Sr. during their October 11 telephone conversation constituted a tip of material, non-public information, in that Moran Jr. signaled Moran Sr. that it was advantageous for him to continue to purchase cable stocks. Finally, although not clearly set forth, the SEC implies that Moran Jr.'s disclosure to Reddan and other employees of Moran Asset during the evening of October 12, constituted a violation of Section 10(b) of the Exchange Act and Rule 10b–5 thereunder. For the following reasons, the court finds that the SEC has not proved its claims by a preponderance of the evidence.

▮ To establish that the defendants violated Section 10(b) of the Exchange Act and Rule 10b–5 thereunder[19], the SEC must show by a preponderance of the evidence that the defendants made improper use of confidential material information in connection with the purchase or sale of securities and that the defendants acted with scienter. *Dirks v. SEC,* 463 U.S. 646, 659–660, 103 S.Ct. 3255, 3263–64, 77 L.Ed.2d 911 (1983); *Aaron v. SEC,* 446 U.S. 680, 695, 100 S.Ct. 1945, 1955, 64 L.Ed.2d 611 (1980); *United States v. Carpenter,* 791 F.2d 1024, 1033–34 (2d Cir.1986), *aff'd by an evenly divided court, Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). A person makes improper use of confidential information when that person obtains material, non-public information intended to be used for a proper purpose and uses it in a breach of a fiduciary duty owed to his employer. *Dirks,* 463 U.S. at 663–64, 103 S.Ct. at 3266; *United States v. Newman,* 664 F.2d 12, 16–19 (2d Cir.1981).

On October 3, 1993, Moran Jr. was "brought over the wall" with regard to the Bell Atlantic/TCI proposed merger. It is beyond dispute that the information he obtained was confidential and non-public. Indeed, Moran Jr., himself, demonstrated that he knew he was in possession of non-public confidential information, specifically testifying that he had admonished two of his research assistants, who had mistakenly seen related information in Moran Jr.'s office, that they had a duty to maintain as strictly confidential the information they had seen. Consequently, as an "insider" Moran Jr. had the requisite fiduciary duty requiring non-disclosure of this material. *SEC v. Texas Gulf Sulphur,* 401 F.2d 833 (2d Cir.1968); *SEC v. Musella,* 748 F.Supp. 1028 (S.D.N.Y.1989), *aff'd,* 898 F.2d 138 (2d Cir.1990) ("*Musella II*").

▮ A "tippee" inherits the tipper's duty if the tipper disclosed the nonpublic information and the tippee knows or should know of the tipper's breach of duty. *SEC v. Carpenter,* 791 F.2d at 1024; *SEC v. Musella,* 578 F.Supp. 425, 438–39 (S.D.N.Y.1984) ("*Musella I*"). Accordingly, "a tippee who knows or is reckless in not knowing that he was trading on misappropriated non-public information violates Rule 10b–5." *Musella II,* 748 F.Supp. at 1038; *see also, Dirks v. SEC,* 463 U.S. at 660, 103 S.Ct. at 3264–65; *SEC v. Vaskevitch,* 657 F.Supp. 312, 314 (S.D.N.Y.1987). If Moran Jr. did tip Moran Sr., it would be unfathomable that Moran Sr. would not know or be expected to know that such information was misappropriated by Moran Jr. from his position at Salomon Brothers. Therefore, any resulting stock trades made by Moran Sr. and his companies would subject him to liability as a tippee. Because both Moran Sr. and Jr. would have known that details regarding the merger were confidential misappropriated information, any trading based on a tip would have been made with the requisite scienter necessary to violate federal insider trading statutes. Scienter is established if it is shown that the defendants acted with a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976); *SEC v. Drexel Burnham Lambert,* 837 F.Supp. 587, 608

---

19. Section 10(b) provides that:

[i]t shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . .
(b) [t]o use or employ, in connection with the purchase or sale of any security registered on a national security registered on a national securities exchange or any security no so registered, an manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors,

Rule 10b–5 provides that:

[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
(a) to employ any device, scheme, or artifice to defraud,
(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under they were made, not misleading, or
(c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

(S.D.N.Y.1993), *aff'd, SEC v. Posner,* 16 F.3d 520 (2d Cir.1994).

■ The record further indicates that the information was material. Moran Jr. allegedly informed his father that Liberty and TCI were about to merge, as well as when the announcement was going to take place. The Supreme Court has stated that for actions arising under Federal securities laws, a fact is material "if there is a substantial likelihood that a reasonable [investor] will consider it important in deciding how to [invest]." *Basic Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988); *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 518 (2d Cir.1994); *Sable v. Southmark/Envicon Capital Corp.,* 819 F.Supp. 324, 334 (S.D.N.Y.1993). Here, information of this magnitude was certain to have an effect on cable stocks. Both Moran Jr. and Sr. were specifically knowledgeable about the cable industry. Accordingly, it is beyond peradventure that each defendant would realize the significance of the information regarding the proposed merger and the likely effect that cable stocks would increase in value. Information regarding an impending transaction that is expected to increase the value of a security is certainly of the type that would be considered by a reasonable investor important with respect to deciding how to invest. *SEC v. Shapiro,* 494 F.2d 1301, 1305 (2d Cir.1974); *Musella II,* 748 F.Supp. at 1040.

■ Hence, the only issue left for the court to resolve with respect to this allegation is whether the SEC has proved by a preponderance of the evidence that Moran Jr. did, in fact, disclose information about the proposed merger to Moran Sr. before such information was public. As previously stated, if Moran Jr. tipped Moran Sr. as to the proposed merger, they would each be liable for securities violations. The court, however, finds that the evidence does not so prove. With the exception of the claims regarding Moran Jr.'s comments to Moran Sr. about his morning meeting notes and the call to Reddan the evening before the announcement was made, the SEC presented no direct evidence of a tip by Moran Jr. to Moran Sr. The court is mindful that "proof of insider trading can well be made through an inference from circumstantial evidence and not solely upon direct testimonial confession." *SEC v. Singer,* 786 F.Supp. 1158, 1164 (S.D.N.Y.1992). Notwithstanding such recognition, however, if the totality of the evidence suggests an equally or more compelling inference than the SEC's allegation, the plaintiff will not have met its burden of proving its case by preponderance of the evidence. The court finds that the SEC has not established its case.

Surely one possible inference that can reasonably be drawn from the evidence presented in this case is that Moran Sr. purchased cable security stocks based on material nonpublic information provided to him by Moran Jr. This inference, however, is not the most likely scenario suggested by the proof. The court finds that the testimony and documentary exhibits suggest that Moran Sr. made his stock purchases on October 11, 1993 as a result of following John Malone, the announcement of the TCI/Liberty merger on October 8, and Moran Sr.'s softening position on cable stocks. Moreover, the court also finds that the amount of purchases were not aberrational to Moran Sr. style of investing in securities. Further, upon closely examining the SEC assertions, the court declines to accept their proposed inferences regarding the alleged telephone tip, and finds the SEC's argument to be inconsistent. Lastly, the court finds that the statements Moran Jr. made to Moran Sr. with respect to the morning meeting notes on October 11, 1993 do not constitute a tip and that while Moran Jr. may have disclosed non-public information during the evening October 12, 1993, there were no trades made by Moran Sr. as a result of such disclosure. In making this determination, the court relies not only on the testimony of Moran Sr. and Jr., but also that of Reddan, who the court finds completely credible, other workers for Moran Sr., and the voluminous documentary evidence, much of which dates well before October 3, 1993, when Moran Jr. was brought "over the wall."

Contrary to the claims of the SEC, the evidence is overwhelming that Moran Sr.

followed Malone. In fact, the record is uncontroverted that the one time Moran Sr. did not react to Malone, he vowed never to be on the wrong side of Malone again. Moran Sr. testified at length as to the power that Malone has over the cable industry. The court credits Moran Sr.'s testimony that he believed Malone to be leader in the cable industry. As previously discussed, there is ample outside evidence such as other broker publications and media articles that lend support to Moran Sr.'s view of Malone. While the SEC is correct that one reason for Moran Sr.'s bearish view on cable was increased government regulation of the industry, another significant reason was that Moran Sr. learned that Malone had liquidated his position in TCI. Reddan testified that concern about regulation and following Malone was virtually "flip sides of the same coin" (R. 781–82). Additionally, Reddan confirmed that Moran Sr. did follow Malone and advised his clients to do the same.

In making its argument that Moran Sr. did not follow Malone, the SEC apparently assumes that "following" Malone is the same as "copying" Malone's investments. Moran Sr. explained, "we don't follow John Malone literally, we follow the substance of what he is doing and then apply it to what makes the most sense given the areas of—the alternative selections that we can make, which are not the same as his because he is limited. As I said before, he chooses to be limited" (R. 1148–49). Moreover, during the period of January 8, 1992 to October 11, 1993, Moran Sr. maintained his holdings in programming, increased his clients' weighting in programming stocks, and purchased most if not all of the Liberty/TCI publicly owned programmers, and followed Malone into the United Kingdom cable television companies (R. 779–781, 1438–39, 1446–51; Exh. 40). The short of the matter is that while Moran Sr. did not simply duplicate investments made by Malone, the evidence before the court nonetheless illustrates a demonstrative pattern of moves made by Moran Sr. that identify his reliance on Malone. Thus, the court finds that Moran Sr. did follow Malone and as

discussed at length in the factual section of this opinion, the court finds that by October 1993, Moran Sr. was softening his view on the cable television industry.

The court is therefore presented with circumstantial evidence that indicates Moran Sr. made his investments on October 11, not because of inside information, but rather because he became aware of Malone's actions which indicated that cable stocks would become lucrative. Aside from the testimony of Moran Sr.[20] there is ample evidence which supports Moran Sr.'s innocent explanation of his purchases. The Liberty/TCI merger took place on October 8, 1993. Over the weekend, Reddan testified that Moran Sr. told him about his game plan to invest in cable stocks. Contrary to the SEC argument, Reddan did not disagree with Moran Sr.'s analysis, but urged a "go slow" approach. The court finds no significance that Moran Sr. did not heed Reddan's or his analysts' warnings to go slow, since Moran Sr. typically disregarded such analysis. Additionally, Moran Sr. has a demonstrated history for buying stocks in large quantities. Indeed, his holdings of cable stocks prior to 1992 and investment in Chambers demonstrates that large percentage acquisitions were common place for Moran Sr. By virtue of the evidence as to how Moran Sr. typically engaged in stock purchases, the court finds that the fact that he bought large amounts of cable stocks for himself and clients is not aberrational.

Merely because the defendants present a reasonable inference from the circumstances which suggests no illegality, does not mean that the plaintiff has failed to fulfill its burden. However, the court finds several troubling aspects to the SEC's theory of liability. Initially, the SEC argues an inconsistent position. On the one hand, the SEC argues that Moran Jr. and Sr. should be considered "a sophisticated tipper and tippee," and that would explain why there was no documented contact between October 9 and October 11. *See,* Plaintiff's Proposed Finding of Fact and Conclusions of Law, p. 21. Since the defen-

---

**20.** The SEC reasonably argues that Moran Sr. is now manufacturing a "cover story" to hide the fact that his real reason for investing was inside information. The court certainly takes this possibility into account and accordingly looks to evidence beyond that of Moran Sr.'s testimony.

dants presumably understood that the SEC's attention would have been drawn by contact during that period, the SEC argues that Moran Sr. and Jr. distanced themselves from each other. On its own this is not an unreasonable proposition, however, under the same theory, the SEC also wants the court to accept that Moran Jr. and Sr. would be foolish enough to give and receive a tip during a 40 minute phone conversation from Moran Jr.'s office to Moran Sr.'s office. A conversation which could be and was documented. Not only that, the SEC asks the court to find that during the time that Moran Sr. was actually engaged in the alleged illegal trade, he would fax his morning meeting notes to Moran Jr., the very morning meeting notes that included the recommendation to buy cable stocks. The court is puzzled as to why Moran Sr. would send these notes to Moran Jr., if as the SEC claims, Moran Sr. was already tipped as to the proposed merger.

Lastly, the SEC asks this court to accept that Moran Jr., "the sophisticated tipper," who had already given the information regarding the merger to his father, would then call his father's firm on the evening before the official announcement and disclose the details of the same merger to at least one employee of Moran Asset and later to Reddan. Considering that Moran Sr. had already made the trades in issue, there is no reason for Moran Jr. to call his father with this information. If he had already tipped his father earlier, as claimed by the SEC, it would have been utterly nonsensical for Moran Jr. to place this call.

The court also has difficulty with the SEC's claim that the fact that there was no documented contact between Moran Sr. and Jr. from October 8 until October 11, is somehow indicative of guilt because it shows that they were attempting to distance themselves from one another or that it was then that the actual tip took place. While this argument is a possible theory, there are other equally possible theories that do not suggest any wrongdoing. One such theory is that the lack of documented contact between Moran Sr. and Jr. was because they truly did not have any contact with each other during that time period. Indeed, the SEC's allegation regarding theoretical secret phone calls from public telephones is nothing more than conjecture which cannot be substituted for evidence. Indeed, even if the court were to assume that there was a tip during that time period or that the defendants were merely attempting to distance themselves, the court is at a loss to explain Moran Sr.'s subsequent fax to Moran Jr. on October 11 and Moran Jr.'s disclosure of the information during the evening of October 12. Certainly, the exchange of this information would be the opposite of distancing. The more logical inference is that there was no tip from Moran Jr. to Moran Sr. in this aspect.

The next claim asserted by the SEC is that Moran Jr.'s statements to Moran Sr. during their October 11 telephone conversation constituted a tip of material, nonpublic information, because it signaled Moran Sr. that it was advantageous to continue purchasing cable stocks. Encouragement to continue to purchase a stock, even if the specific advantageous information is not included in the conversation, and a resulting purchase of the security can be a violation of the prohibition against insider trading. *See, SEC v. Drexel Burnham Lambert, Inc.,* 837 F.Supp. 587, 597–98 (S.D.N.Y.1993), *aff'd, SEC v. Posner,* 16 F.3d 520 (2d Cir.1994); *SEC v. First City Financial Corp.,* 688 F.Supp. 705, 712–13 (D.D.C.1988), *aff'd,* 890 F.2d 1215 (D.C.Cir. 1989). But in this case, the court finds that Moran Jr.'s statements that the morning meeting notes were "well presented" do not constitute a tip for the purposes of the securities law. Moran Jr. testified that he used that response rather than just say no comment because he believed that if he refused to provide an answer, Moran Jr.'s silence would have communicated to his father that there was something imminently about to happen in the cable industry. Specifically Moran Jr. stated, "if I told him no comment that could be a signal to him that I was working on something, and I purposely avoided signaling anything to him in any way" (R. 725–6). Considering that the morning meeting notes did not address any possibility of a merger, it was entirely proper for Moran Jr. to answer the way he did. If he had refused comment, Moran Sr. might then

have realized that there was some other aspect to consider. Moreover, considering the conversation took place in the late afternoon after most of the trading was already completed, the conversation between Moran Sr. and Jr., does not appear to be a tip. Additionally, there is no proof that Moran Sr. ever had any hesitancy regarding his purchase of cable stocks. Actually, the evidence demonstrates just the opposite, despite the fact that Moran Sr.'s employees wanted him to slow down, he ignored their requests. Therefore, it is not likely that Moran Sr. was worried about seeking any confirmation from Moran Jr. as to whether the stock purchase was still a good idea. Thus, the court finds that the conversation on October 11, 1993 between Moran Sr. and Jr. does not constitute a violation of the Exchange Act.

The last theory, apparently advanced by the SEC, suggest that Moran Jr.'s October 12th disclosures of the merger details, somehow constituted insider trading. The court rejects this theory. The evidence, in part, leaves no question that the details disclosed by Moran Jr. were material, non-public, and confidential information. The mere disclosure of the information, however, is not sufficient to establish a violation of the Exchange Act. In order to violate § 10(b) of the Exchange Act, the fraud must be "in connection with the purchase or sale of any security registered on a national security exchange or any security not so registered." 15 U.S.C. § 78j(b) (emphasis added); *see also, Carpenter*, 484 U.S. at 24, 108 S.Ct. at 319–20. In this case, the purchases of the securities at issue had previously occurred on October 11. Since it is undisputed that there were no security purchases of cable stock after Moran Jr. disclosed the merger information and prior to the public announcement of the merger, there can be no liability for insider trading. Consequently, since the SEC has not demonstrated by a preponderance of the credible evidence that Moran Sr.'s stock purchases were made as a result of material non-public information disclosed by Moran Jr., the court finds for the defendants with respect to that charge.

## C.

The remaining allegations by the SEC only relate to Moran Sr., Moran Asset, and Moran Brokerage. Of those remaining claims the SEC first alleges that Moran Sr. and Moran Asset violated sections 206(1) and (2) of the Advisers Act [21] in connection with the allocation of Liberty stock to Moran Sr.'s personal and family accounts. Essentially, the SEC alleges that by allocating Liberty stock to his personal and family accounts and requiring his clients to pay a higher price for the stock the next day, Moran Sr. and Moran Asset placed their own interests ahead of their clients thereby violating the fiduciary duty owed to those clients. Moran Sr. responds with three arguments.

First, Moran Sr. contends that the allocation of stock in a particular instance is not covered by the Investment Advisers Act. However, even if the court were to find that the transaction was covered under the act, Moran Sr. next claims that Section 206(1) requires proof of scienter which asserts is not present in this case. Finally, Moran Sr. insists that the single mistake regarding how much Liberty stock Moran Asset had does not constitute negligence under Section 206(2). For the following reasons, the court finds that the Advisers Act does apply to situations such as the one presented in the case at bar; that scienter is required under Section 206(1) and is not present in this case; but that the actions of Moran Sr. and Moran Asset constitute negligence and therefore violate section 206(2) of the Advisers Act.

Section 206 of the Advisers Act establishes a statutory fiduciary duty for investment advisers to act for the benefit of their clients, requiring advisers to exercise

21. Section 206 of the Advisers Act provides:
It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
(1) to employ any device, scheme, or artifice to defraud any client or prospective client;

(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client. *See,* 15 U.S.C. 80b–6.

the utmost good faith in dealing with clients, to disclose all material facts, and to employ reasonable care to avoid misleading clients. *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 17, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979); *Burks v. Lasker,* 441 U.S. 471, 482 n. 10, 99 S.Ct. 1831, 1839 n. 10, 60 L.Ed.2d 404 (1979); *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 472 n. 11, 97 S.Ct. 1292, 1300 n. 11, 51 L.Ed.2d 480 (1977); *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 191–92, 84 S.Ct. 275, 282–83, 11 L.Ed.2d 237 (1963). Although Moran Sr. maintains that Section 206 is limited only to misrepresentations or material omissions [22], the court does not accept such a limiting analysis. By its own language Section 206(1) and (2) makes illegal "*any* device, scheme, or artifice to defraud," and "*any* transaction or course of business which operates as a fraud." *See also, Capital Gains,* 375 U.S. at 196, 84 S.Ct. at 285 (discussing the broad sweeping reform intended by the Advisors Act and stating that by passing the Advisers Act, Congress empowered federal courts "to enjoin *any* practice which operates as a fraud or deceit upon a client") (emphasis added). Considering the broad language of the statute and the fact that the subsections do not even contain the words "misrepresentation" or "omission," it is difficult to conceive of how Section 206 could be limited to only those concepts. Considering that the plain language of the statute does not limit Section 206 as argued by Moran Sr., the court interprets Section 206 to establish a fiduciary duty which in addition to applying to misrepresentations and omission, also requires the investment advisor to act in the best interests of its clients. *See e.g., SEC v. Capital Gains Bureau,* 375 U.S. at 195, 84 S.Ct. at 284–85 ("Congress intended the Investment Advisers Act of 1940 to be construed like other securities legislation 'enacted for the

purpose of avoiding frauds,' not technically and restrictively, but flexibly to effectuate its remedial purposes."); *In the Matter of Chancellor Capital Management, Inc.,* Admin.Proc. File No. 3–8524, 1994 WL 570098 (October 18, 1994) (1994 SEC LEXIS 3184); *In the Matter of Joan Conan,* Admin.Proc. File No. 3–8504, 1994 WL 549000 (September 30, 1994) (1994 SEC LEXIS 3075). Hence, Section 206 is applicable to a claim that Moran Asset and Moran Sr. allocated Liberty Shares to the Moran Sr.'s personal and family accounts to the detriment of the firm's clients.

■ Since the section is applicable to the alleged actions of Moran Sr. and Moran Asset, the court must next determine if Moran Sr.'s conduct constitutes a violation of the statute. The Supreme Court has unequivocally stated that in order for a defendant to be liable under section 10(b) and 17(a)(1) of the Exchange Act, it must be shown that the defendant acted with scienter. *Aaron v. SEC,* 446 U.S. at 697, 100 S.Ct. at 1956; *Ernst & Ernst Hochfelder,* 425 U.S. at 194, 96 S.Ct. at 1381–82. While the Supreme Court has never specifically addressed the issue of scienter and its application to Section 206(1) of the Advisers act, because the language of Section 206(1) is identical in all relevant respects to the language of § 17(a)(1), the court concludes that a showing of scienter on the part of the defendant is required to establish liability under Section 206(1). *Accord, SEC v. Steadman,* 967 F.2d 636, 641 (D.C.Cir.1992); *Steadman v. SEC,* 603 F.2d 1126, 1134 (5th Cir.1979), *aff'd on other grounds,* 450 U.S. 91, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981).

■ It therefore follows that in order to successfully litigate a claim under Section 206(1), the SEC must prove that the [defen-

---

22. Moran Sr. cites two cases in support of his claim that the Advisers Act only applies to misrepresentations. In *SEC v. Wall Street Publ. Inst., Inc.,* 591 F.Supp. 1070, 1082 (D.D.C.1984), *rev'd on other grounds,* 851 F.2d 365 (D.C.Cir. 1988), the district court merely quoted the duty of an adviser as set out by the Supreme Court in *Capital Gains.* That court did not in any way state that interpretation of that duty was limited to omissions or misrepresentations. In the second case cited by Moran Sr., it is true that the

district judge stated that Section 206 "speak[s] solely and exclusively to concealment and misrepresentation," before going on to find that there had been no mismanagement of accounts in any case. *Jones Memorial Trust v. Tsai Inv. Servs., Inc.,* 367 F.Supp. 491, 497 (S.D.N.Y. 1973). In any case, even if the *Jones Memorial* court believed that Section 206 was so limited, for the reasons set forth above, the court declines to follow such a narrow reading of the Advisers Act.

dants] acted with an "intent to deceive, manipulate, or defraud." *Steadman*, 967 F.2d at 641. In *Steadman*, the D.C. Circuit stated that it was in agreement with a number of other circuits that extreme recklessness could satisfactorily show the requisite scienter on the part of a defendant. *Id.* (joining with the 11th, 9th, and 5th Circuits in so finding). However, the kind of recklessness required has been termed "a lesser form of intent." *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir.1977). "The kind of recklessness required, however, is not, merely a heightened form of ordinary negligence; it is an extreme departure from standards of ordinary care, which presents a danger of misleading buyers or sellers." *Steadman*, 967 F.2d at 641–42. The evidence does not demonstrate either the requisite intent or recklessness on the part of Moran Sr. or Moran Asset to impose liability under Section 206(1).

It is plain from the record that Moran Sr.'s original game plan was to allocate smaller cable stocks to his personal account and that the only reason Liberty, TCI, and Comcast were allocated to those accounts was because of the mistake regarding LTRS and the miscalculation by Moran Sr. and Poli as to whether enough Liberty stock had been purchased. The court credits Poli, who testified that he "had no idea how many [Liberty shares] we had purchased at that point because I had piles of tickets in front of me, and I just thought we had purchased too many shares" (R. 1020). Moreover, the court also accepts that on the busiest day of trading ever experienced by Moran Asset, at the time the Liberty shares were allocated to Moran Sr.'s personal and family accounts, both Moran Sr. and Poli believed that there was enough Liberty stock, particularly because LTRS could not accept any of the shares purchased. Considering that the

same mistake was also made in allocating Comcast stock, a mistake which actually benefited Moran Asset clients, it cannot be said that Moran Sr. acted with an intent to defraud clients. Similarly, while the action may have been negligence on the part of Moran Asset and Moran Sr., as will be discussed below, it does not rise to the level of the more exacting standard of recklessness necessary to support a finding of a violation of Section 206(1).

 Unlike Section 206(1), a simple finding of negligence will satisfy a finding of liability under Section 206(2). *SEC v. Steadman*, 967 F.2d at 643; *SEC v. Wall Street Publishing Institute, Inc.*, 591 F.Supp. at 1083 (under section 206(2) there is no required showing of scienter); *see also, SEC v. Capital Gains*, 375 U.S. at 195, 84 S.Ct. at 284 ("Congress, in empowering the courts to enjoin any practice which operates as fraud or deceit upon a client, did not intend to require proof of intent to injure and actual injury to the client."). The evidence is overwhelming that Moran Asset and Moran Sr.[23] acted negligently in assigning to Moran Sr.'s personal and family accounts Liberty stocks to the detriment of the Moran Asset clients. Of course Moran Asset and Moran Sr. had a duty to act in the best interests of his clients, yet Moran Sr. allowed the allocation of stock to his personal accounts without making certain that enough Liberty stock had been accumulated for his clients.

Indeed, the impression that enough Liberty stocks had been purchased was not based on checking the amount of Liberty shares that had been acquired at the end of trading or any other analysis. Inexplicably, Moran Sr. and Poli merely guessed that they had purchased enough Liberty stock. During the evening of October 11, Poli prepared an allo-

---

**23.** There can be no question of Moran Sr.'s personal liability under Section 206(2). The fact that he was in sole control of Moran Asset creates the inference that he was involved in every important activity of his company. *Steadman v. SEC*, 603 F.2d 1126, 1135 (5th Cir.1979), *aff'd*, 450 U.S. 91, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981). In this case, there is much more than an inference presented to the court. It was Moran Sr. who decided that Liberty shares were to be placed in his personal and family accounts.

Moran Sr. was present while Poli allocated the shares of stock and signed off on the allocation sheets ordering the distribution of Liberty stock to his personal and family accounts. The very same sheets which illustrated that some clients were not going to receive any Liberty stock. All of this evidence paints an obvious picture that it was Moran Sr.'s negligence that specifically caused the loss to his clients. Accordingly, since it was Moran Sr.'s actions which trigger liability of Moran Asset, he can be held personally liable.

cation sheet designating the allocation of Liberty stock to Moran Asset clients. This document, which was reviewed by Moran Sr., clearly indicated that several accounts would not receive any Liberty stock. Even assuming that at this point Moran Sr. did not know the reason why those accounts were not receiving Liberty stock, the fact that he made no inquiry as to why there was to be no allocation is further evidence of negligence. The allocation sheet for Liberty Stocks makes it plain that Moran Asset had "under bought" Liberty stocks (Exh. 52).

Finally, Moran Sr. offers no plausible explanation as to why he did not reallocate shares from the personal and family account and provide those shares to his clients, rather than purchase additional shares of stocks for his clients accounts at a higher price. Clients for whom Moran Asset purchased the additional 34,000 shares of Liberty stock on October 12 paid an average price of $26.875, which was 0.619 more per share than if Moran Asset had allocated to them shares that had been purchased on October 11 (Exh. 52). Other than calling this action "one isolated incident," Moran Sr. offers no explanation as to why one incident can be considered one incident of negligence [24]. *See* Moran Sr. Post–Trial Brief, p. 38. Indeed, all of the evidence indicates that this one incident was negligence. Thus, the court finds that by allocating Liberty shares to Moran Sr.'s personal and family accounts under these circumstances, Moran Sr. and Moran Asset negligently placed their own interests ahead of their clients, thereby breaching the fiduciary duty owed to the clients in violation of Section 206(2) of the Advisers act.

### D.

The final two claims relate to omissions on Moran Asset's Form ADV and Moran Brokerage's Form BD. The SEC alleges that Moran Asset and Moran Sr. violated Section 207 of the Advisers Act [25] and that Moran Asset, aided and abetted by Moran Sr., violated Section 204 of the Advisers Act and Rule 204(b)(1) (17 C.F.R. § 275.204(b)(1)) promulgated thereunder, by failing to timely amend its Form ADV to reflect the fact that Moran Sr.'s wife and two sons were made directors of Moran Asset. Similarly, the SEC maintains that Moran Brokerage and Moran Sr. violated Section 15b (15 U.S.C. § 78o (b)) [26] of the Exchange Act and Rule 15b3–1 (17 C.F.R. § 240.15b3–1) thereunder by failing to amend Moran Brokerage Form BD to disclose that Moran Jr. and his brother had been made directors. The facts surrounding these charges are not really in dispute. Defendants admit that on both the Form ADV and the Form BD neither Moran Sr.'s wife Joan, and two sons Clayton and Fred Jr. were listed as directors when in fact all three had been established as directors for Moran Asset. Also, despite the fact that they had been elected, Clayton and Fred Jr. were never listed as directors of Moran Brokerage. It is further uncontested that although the Form ADV was amended in March 1994 to include Joan Moran as a director, Moran Jr. and Clayton were not added until two months later.

**24.** Both Moran Sr. and the SEC argue with respect to the propriety of an injunction in this case. The court will not consider those arguments at this time since the trial was bifurcated, at the request of the litigants, between liability and any subsequent penalty phase. The parties will have a full opportunity to present any arguments with respect to the penalty phase of this case.

**25.** Section 207 of the Advisers Act provides:
[i]t shall be unlawful for any person willfully to make any untrue statements of material fact in any registration application or report filed with the Commission under Section 203 or 204, or willfully to omit to state in any such application or report any material fact which is required to be stated therein.
15 U.S.C. § 80b–7. Rule 204–1(d) provides that every amendment to a Form ADV shall constitute a "report" for the purposes of Sections 204 and 207. 17 C.F.R. § 275.204–1(d).

**26.** Section 15b(4)(A) of the Exchange Act reads:
The Commissioner, by order, shall censure, place limitations on the activities ... of any broker or dealer if it finds, ... that such broker dealer ...
(A) has willfully made or cased to be made in any application for registration or report required to be filed with the Commission ... any statement which was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, or has omitted to state in any such application or report any material fact which is required to be stated therein.
*See,* 15 U.S.C. § 78o (b).

The SEC maintains that these omissions were made willfully and constituted material information, and therefore the omissions are violations of law. In addition to the liability of the corporations, the SEC argues that Moran Sr. is a control person of each of these corporations and therefore also liable for their omissions. Further, the SEC argues that since it was Moran Sr. who signed off on the forms, he is subject to aiding and abetting liability. Defendants respond that the omissions do not constitute a violation of the securities law because the omissions were neither material nor willful. For the following reasons the court finds that Moran Sr.'s, Moran Asset's and Moran Brokerage's omissions constituted violations of the applicable securities law.

Since it is uncontested that the forms were improperly filed with the Commission in that the directors were not disclosed, there are only two issues which must be addressed. The court's initial determination is whether the omitted information was material. If so, the court must then decide if the evidence shows that Moran Sr. acted willfully in withholding the names of the directors. In the context of the securities laws, for a fact to be material "there must be a substantial likelihood that the disclosure of the omitted fact, would have been viewed by the reasonable investor as having significantly altered the 'total' mix of information available." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Nelson v. Paramount Communications, Inc.*, 872 F.Supp. 1242, 1245 (S.D.N.Y.1994). The Supreme Court has noted that the materiality of information will greatly dependant on the facts of the particular case. *Basic, Inc. v. Levinson*, 485 U.S. 224, 239–40, 108 S.Ct. 978, 987–88, 99 L.Ed.2d 194 (1988). Here, the evidence shows that the identities of Moran Asset's and Moran Brokerage's directors were material.

Moran Sr. argues that even "[a]ssuming Moran Asset and Moran Brokerage's clients reviewed the Form ADV and Form BD, the total mix of facts available to them was not substantially altered by the technical failure to list three individuals on a multi-page government registration form, none of whom played any role in the management or opera-

tions of the business." *See*, Moran Sr.'s Post–Trial Brief, at 43. The court finds this characterization to understate the importance of the information. The "three individuals" were directors of the corporations. There can be no question that the identity of the directors will in many cases be material since their disclosure reveals such significant issues as; who has corporate control and influence on the management of the firm, whether there is director independence, and whether the directors bring any potential conflict of interest to the firm. Considering that Moran Jr. was affiliated with another regulated entity, it is likely that potential investors would consider that fact. However, because the information was not disclosed, any potential investor was unable to do so. Significantly, even Moran Sr. testified that he believed disclosure that his sons were directors would have added to his firms credibility (R. 1561). In making this statement, Moran Sr. virtually admits that the identities of a company's directors constitutes important information that will be used by a potential client when deciding whether become a client of the company. That Moran Sr. believes potential investors would take into account a director's background when assessing Moran Asset demonstrates that the information is material.

Moreover, the court disagrees with Moran Sr.'s over-simplified description of the Forms ADV and BD as merely "a multi-paged government registration form." In point of fact, the SEC has stated that Form ADV and amendments to it are:

> a basic and vital part in our administration of the Act, and it is essential in the public interest that the information required by the application form be supplied completely and accurately. The application form obligates the applicant to verify that all statements contained in it are true, correct and complete to the best knowledge of the person executing the form.

*In the Matter of Justin Federman Stone*, 41 S.E.C. 717, 723 (1963). The court agrees with this view of the Forms as it certainly furthers the interest of public disclosure, informed decision making, and allows the SEC to monitor securities transactions in order to fulfill the legislative mandate behind the establishment of the securities acts at issue.

Of particular importance are the specific facts about Moran Asset and Brokerage that illustrate the importance of the information contained in the Forms ADV and Form BD. Moran Sr. described his company's use of the Forms ADV. He testified:

> What we did with our ADV is we gave it to clients before they became clients. Frankly, I don't even like the term promotional material because we never promoted our business. We never went out and aggressively solicited clients. The bulk of our clients came to us because of my reputation, and we always gave the clients the ADV before they have became (*sic*) clients. We generally gave them the ADV and our brochure.

(R. 1596). In addition, Moran Sr.'s brochure would refer prospective clients to his Form ADV for a more complete explanation of his firm (R. 1596–97). In its literature, Moran Asset advertised itself as an employee-owned business, despite the fact that his sons, who were not employees were directors (Exhs. 87–88).

Therefore, considering the important nature of the identities of corporate directors, Moran Sr.'s testimony that potential clients would have been favorably influenced if they knew the background of the directors, Moran Asset's and Brokerage's use of the Forms as promotional material, Moran Asset's and Brokerage's invitation for potential clients to review the forms, and the relevance of the Forms relating to whether Moran Asset was an "employee owned" business, the court concludes that the omitted information was material within the meaning of the statutes.

Next, the court turns to the question of whether the omissions were "willful" as set forth in the Advisor and Exchange Acts. Moran argues that "the SEC points to *no* evidence to support a finding that the omissions were intentional" (Moran Sr. Reply brief, p. 27) (emphasis in the original). To have acted willfully requires "intentionally committing the act which constitutes the violation. There is no requirement that the actor also be aware that he is violating one of the Rules or Acts." *Tager v. SEC,* 344 F.2d 5, 8 (2d Cir.1965); *see also, In the Matter of Frank Humphreys,* 48 S.E.C. 161, 164 (1985). Thus, the actors merely had to intend to engage in the action alleged regardless of his knowledge that the act constituted a violation of the securities law.

In the case of the Forms ADV, investment advisers are required to disclose information about their corporate directors. Moran Asset's Form ADV became inaccurate on December 1, 1991, when Moran Jr., Clayton Moran, and Joan Moran became directors. From that date until May 1994, after the SEC during the course of the investigation uncovered the omissions, Moran Asset failed to disclose that Moran Sr.'s sons were directors of the company and it was only March 1994 when it was disclosed that Moran Sr.'s wife was a director. With respect to the Form BD, Rule 15b3–1 was adopted to ensure that a registered broker dealer promptly files an amendment to its application. Moran Jr. and Clayton Moran became directors of Moran Brokerage in December 1991 and no correcting amendment was filed until nearly two and one half years later. By any standard, Moran Sr. and Moran Brokerage cannot be considered to have promptly amended the form BD.

The proof in this case reveals that Moran Sr. acted willfully in withholding this information. Initially there can be no doubt that Moran Sr. had an obligation to file a current, accurate, and complete Form ADV and Form BD, which included a duty to make reasonable inquiry in order to ensure that the information correct. Here, even accepting Moran Sr.'s claim of oversight, he nonetheless swore that the information contained in the forms was accurate and complete when he had no idea whether this was true. By signing the form without even a cursory check of its validity, Moran Sr. actions can be determined to be willful. He certainly intended to sign the forms and thus give the underlying assurances.

Beyond this however, the evidence at trial leads to the conclusion that Moran Sr. acted with knowledge and intended to conceal that his sons were directors. Moran Sr. did not even tell his sons that he made them directors. Certainly this is an indication that he was acting surreptitiously. In addition, the entire testimony regarding Moran Sr. and his demeanor before the court demonstrates that he is a person who is very much in control of his business. Moran Sr. testi-

fied that Squeo, who had filled out the Form ADVs made several errors and as a result, Moran Sr. emphasized to Squeo that the errors in the forms must not be repeated. The court finds it entirely unbelievable that Moran Sr. would not have looked over the forms to assure the accuracy of the forms. Incredibly, Moran Sr. testified that he never learned from Squeo why the names of the directors were not included in the forms (R. 1235). Moreover, the Form ADV was corrected with respect to Moran Sr.'s wife, but not to his sons. The fact that the sons were still omitted even though the form was supposedly corrected, leads to the unmistakable conclusion that the omissions were intentional. Even more troubling was that Moran Jr.'s signature was forged[27] on documents that Moran Sr. signed as a director. The court simply cannot accept that Moran Sr. was unaware of the fact that his son did not actually sign the corporate documents. Although Moran Sr. testified that he had no idea how the forgeries came to appear on the cooperate resolutions, the court finds it mystifying that Moran Sr. could not explain why his son, who Moran Sr. had appointed as a director, did not actually sign the resolutions. The only reasonable inference from this evidence is that Moran Sr. intended to omit reference to Moran Jr. and Clayton as directors.

Although he testified that he believed it would have been beneficial to include his sons as directors on the forms, the court finds this argument to be unavailing. If it would have been as beneficial as claimed by Moran Sr., considering the input Moran Sr. has in the business, he would have made it his business to ensure that his sons were listed on the forms. In addition to not making certain that his sons were included, Moran Sr. also signed other filings claiming that his sons were not directors. In a Schedule 13D filed on December 11, 1992, over a year after he had made his sons directors, Moran Sr. stated "Mr. Moran is the President, sole director and sole stockholder of both Moran Asset Management and Moran & Associates" (Exh. 31 at 4). Finally, in Moran Asset promotional material, the company was de-

scribed as employee owned, however, if Moran Jr. and his brother were listed as directors for all potential clients to see, Moran Asset could not have made such a claim. In light of this overwhelming evidence, the court concludes that Moran Sr. acted "willfully" within the meaning of the statutes.

Moran Sr., a control person of Moran Asset and Moran Brokerage, signed the amendments to the form ADV on behalf of Moran Asset and the Form BD on behalf of Moran Brokerage. *See, Index Fund, Inc. v. Hagopian,* 609 F.Supp. 499, 506 (S.D.N.Y.1985) (to be a control person the defendant must have "the power to exercise control over the primary violator, based on a special relationship such as agency or stock ownership."). Because Moran Asset failed to promptly file amendments to the Form ADV to correct the listing of its directors and in the amendments that were filed, Moran Asset and Moran Sr. willfully omitted to state material facts that were required, it violated Sections 204 and 207 of the Advisers Act and Rule 204–1(b)(1) thereunder. Similarly, because of the failure to promptly file amendments to its Form BD when its application became inaccurate, Moran Brokerage and Moran Sr., as a control person, violated Section 15(b) of the Exchange Act and Rule 15b3–1 thereunder.

## CONCLUSION

The court finds that:

(1) Frederick W. Moran, Frederick A. Moran, Moran Asset Management, and Moran & Associates Securities Brokerage did not violate Section 10(b) of the Exchange Act and Rule 10b–5 thereunder [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5] and therefore the court dismisses that claim with prejudice;

(2) Frederick A. Moran and Moran Asset Management did not violate Section 206(1) of the Advisers Act [15 U.S.C. § 80b–6(1)] and therefore the court dismisses that claim with prejudice;

(3) Frederick A. Moran and Moran Asset Management did violate Section 206(2) of the Advisers Act [15 U.S.C. § 80b–6(2)] and therefore finds for the Securities and Exchange Commission on that claim;

---

27. Although the testimony of a handwriting expert on the point of Moran Jr.'s signature was not offered, neither party questions that with the exception of the ratifying document, none of the purported Moran Jr. signatures which appeared on the corporate resolutions were genuine.

(4) Frederick A. Moran and Moran Asset Management did violate Section 204 of the Advisers Act and Rule 204–1(b)(1) thereunder [15 U.S.C. § 80b–4; 17 C.F.R. § 275.204–1(b)(1) ] and therefore finds for the Securities and Exchange Commission on that claim; and

(5) Frederick A. Moran and Moran & Associates Securities Brokerage did violate Section 15(b) of the Exchange Act and Rule 15b3–1 thereunder [15 U.S.C. § 78o(b); 17 C.F.R. § 240.15b3–1] and therefore finds for the Securities and Exchange Commission on that claim.

Pursuant to the court's October 30, 1995 order, the plaintiff and the remaining defendants are to contact the court within thirty (30) days of this decision to establish a date for a hearing on the penalty portion of this trial.

**IT IS SO ORDERED.**